No. 23-3237

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

BIO GEN, LLC, et al.,
Plaintiffs-Appellees,

v.

SARAH HUCKABEE SANDERS, et al.
Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Arkansas
No. 4:23-CV-718 (Hon. Billy Roy Wilson)

## Defendants-Appellants' Brief

TIM GRIFFIN
  Arkansas Attorney General

NICHOLAS J. BRONNI
  Arkansas Solicitor General

DYLAN L. JACOBS
  Deputy Solicitor General

ASHER STEINBERG
  Senior Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-1051
Asher.Steinberg@arkansasag.gov

## SUMMARY OF THE CASE AND STATEMENT
## REGARDING ORAL ARGUMENT

In 2018, Congress legalized hemp at the federal level, defining it as the cannabis plant or any part of it with only 0.3% or less of cannabis's most common psychoactive chemical, delta-9 tetrahydrocannabinol (or THC). That definition does not include products with synthetic chemicals that mimic delta-9 THC; they are not a part of the cannabis plant in the first place. Nevertheless, unscrupulous producers moved to fill a perceived loophole in the federal definition by selling vapes, gummies packaged like candy, and even children's cereal infused with synthetic THCs. After Arkansas (like its sister states) saw dozens of children sickened by these products, its General Assembly banned them. A group of producers and retailers sued, claiming Arkansas's law was preempted, and the district court agreed.

The district court badly erred. Arkansas's law doesn't actually differ from federal law; it merely makes clear what the Drug Enforcement Administration says federal law already says. But even if it did, it wouldn't matter. The law legalizing hemp at the federal level expressly disclaimed preemption of more stringent state regulation—even where States chose to work with the federal government in regulating hemp production. And Arkansas's law expressly carves out interstate transportation, thus avoiding the one form of regulation federal law says is preempted.

Defendants request no more than 15 minutes for argument.

# TABLE OF CONTENTS

Summary of the Case and Statement Regarding Oral Argument ............................ i

Table of Contents ............................................................................. ii

Table of Authorities ......................................................................... iv

Statement of Jurisdiction ................................................................... x

Statement of the Issues Presented ......................................................... xi

Statement of the Case ....................................................................... 1

    A.  Federal Regulation of Marijuana and Hemp ........................................... 1

    B.  The Effects of Federal Hemp Legalization ........................................... 4

    C.  Arkansas Regulation of Hemp and Synthetic Cannabinoids ............................ 6

    D.  Factual and Procedural Background .................................................. 8

Standard of Review .......................................................................... 14

Summary of the Argument ..................................................................... 15

Argument .................................................................................... 18

    I.  The district court's preliminary injunction should be reversed because Plaintiffs cannot succeed on the merits of their claims. ................. 18

    A.  The district court failed to apply the proper legal standard. .................. 18

    B.  Plaintiffs cannot succeed on their various preemption claims. ................... 18

        1.  Act 629's definition of hemp is consistent with the federal definition of hemp. .............................................. 19

        2.  Even if Arkansas's definition of hemp were more stringent than federal law's, Plaintiffs' conflict-preemption claim would still fail. ................................... 26

        3.  Even if Arkansas's definition of hemp were more stringent than federal law's, Plaintiffs' express-preemption claim would still fail. .................................. 34

    C.  Plaintiffs cannot succeed on their vagueness claim. ............................. 38

II. The other preliminary-injunction factors weigh in favor of Defendants. ................................................................................42

III. The Governor and Attorney General are entitled to dismissal because they have sovereign immunity from this suit. .................................44

Conclusion ................................................................................................49

Certificate of Compliance ........................................................................50

Certificate of Service ...............................................................................51

# TABLE OF AUTHORITIES

**Cases**

*281 Care Comm. v. Arneson*,
  638 F.3d 621 (8th Cir. 2007) ............................................................46

*Abbott v. Perez*,
  138 S. Ct. 2305 (2018)......................................................................43

*Adam & Eve Jonesboro, LLC v. Perrin*,
  933 F.3d 951 (8th Cir. 2019) ......................................................x, 39

*AK Futures LLC v. Boyd St. Distro, LLC*,
  35 F.4th 682 (9th Cir. 2022) ............................................................25

*Ark. Times LP v. Waldrip*,
  37 F.4th 1386 (8th Cir. 2022) (en banc) ..........................................37

*Balogh v. Lombardi*,
  816 F.3d 536 (8th Cir. 2016) ............................................................14

*Booker v. State*,
  335 Ark. 316, 984 S.W.2d 16 (1998) ................................................37

*C.Y. Wholesale, Inc. v. Holcomb*,
  965 F.3d 541 (7th Cir. 2020) ....................................x, 29-30, 35-36

*Calzone v. Hawley*,
  866 F.3d 866 (8th Cir. 2017) ............................................................45

*Carson Petroleum Co. v. Vial*,
  279 U.S. 95 (1929)............................................................................36

*Century Indem. Co. v. Carlson*,
  133 F.3d 591 (8th Cir. 1998) ............................................................36

*Chamber of Com. of U.S. v. Whiting*,
  563 U.S. 582 (2011)..........................................................................27

*Church v. Missouri*,
  913 F.3d 736 (8th Cir. 2019) ............................................................45

*CTS Corp v. Waldburger*,
  573 U.S. 1 (2014)..............................................................................28

*Dakota Indus., Inc. v. Ever Best Ltd.*,
  944 F.2d 438 (8th Cir. 1991) ............................................................18

*Dig. Recognition Network, Inc. v. Hutchinson*,
 803 F.3d 952 (8th Cir. 2015) ................................................... x, 44-45

*Duke's Invs. LLC v. Char*,
 Civ. No. 22-00385, 2022 WL 17128976 (D. Haw. Nov. 22, 2022)...................31

*Ex parte Young*,
 209 U.S. 123 (1908)............................................................... 44-45

*Free Spirit Organics, NAC v. San Joaquin Cnty. Bd. of Supervisors*,
 No. 2:17-CV-02271, 2022 WL 902834 (E.D. Cal. Mar. 25, 2022) ...................31

*Freightliner Corp. v. Myrick*,
 514 U.S. 280 (1995).................................................................28

*Gafford v. Allstate Ins. Co.*,
 2015 Ark. 110, 459 S.W.3d 277 (2015) ..............................................38

*Gibson v. Ark. Dep't of Corr.*,
 265 F.3d 718 (8th Cir. 2001) ......................................................45

*Hemp Indus. Ass'n v. Drug Enf't Admin.*,
 357 F.3d 1012 (9th Cir. 2004) .....................................................42

*Holder v. Humanitarian L. Project*,
 561 U.S. 1 (2010)...................................................................39

*Keller v. City of Fremont*,
 719 F.3d 931 (8th Cir. 2013) ......................................................27

*Lorillard Tobacco Co. v. Reilly*,
 533 U.S. 525 (2001)..............................................................x, 28

*Maryland v. King*,
 567 U.S. 1301 (2012) (Roberts, C.J., in chambers)..................................43

*McDaniel v. Precythe*,
 897 F.3d 946 (8th Cir. 2018) ...................................................... ix

*Monson v. Drug Enf't Admin.*,
 589 F.3d 952 (8th Cir. 2009) ....................................................2, 41

*N.H. Hemp Council, Inc. v. Marshall*,
 203 F.3d 1 (1st Cir. 2000)...........................................................1

*No. Va. Hemp & Agric. LLC v. Virginia*,
 — F. Supp. 3d —, 2023 WL 7130853 (E.D. Va. Oct. 30, 2023)........................30

*Org. for Black Struggle v. Ashcroft*,
978 F.3d 603 (8th Cir. 2020) ............................................................43

*Planned Parenthood of Ark. & E. Okla. v. Jegley*,
864 F.3d 953 (8th Cir. 2017) ................................................ 10, 14, 18

*Planned Parenthood Minn., N.D., S.D. v. Rounds*,
530 F.3d 724 (8th Cir. 2008) (en banc) ........................... x, 10, 14, 18

*Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*,
428 F.3d 1139 (8th Cir. 2005) ...........................................................46

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947).............................................................................28

*Smith v. United States*,
269 F.2d 217 (D.C. Cir. 1959) .............................................................1

*St. Louis Effort for AIDS v. Huff*,
782 F.3d 1016 (8th Cir. 2015) ...........................................................14

*State v. Knight*,
318 Ark. 158, 884 S.W.2d 258 (1994) ...............................................46

*United States v. Tucor Int'l, Inc.*,
189 F.3d 834 (9th Cir. 1999) .............................................................36

*United States v. Walton*,
514 F.2d 201 (D.C. Cir. 1975)..............................................................1

*Walling v. Jacksonville Paper Co.*,
317 U.S. 564 (1943)............................................................................36

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008)................................................................................14

*Wuebker v. Wilbur-Ellis Co.*,
418 F.3d 883 (8th Cir. 2005) ........................................................ 27-28

**Statutes & Constitutional Provisions**

7 U.S.C. 1639*o* ..................................................................................34

7 U.S.C. 1639*o*(1) ....................................................................2-3, 20, 23

7 U.S.C. 1639p(a)(1)................................................................. 3, 31, 32

7 U.S.C. 1639p(a)(2)(A) .......................................................................3

7 U.S.C. 1639p(a)(3)(A) ................................................. x, 3, 4, 29, 32

7 U.S.C. 1639p(a)(3)(A)(ii) ...............................................29

7 U.S.C. 1639p(f)(2) .............................................................4

7 U.S.C. 1639q(a)(1) .............................................................3

7 U.S.C. 6502(22) ................................................................40

21 U.S.C. 802(16) ..................................................................1

21 U.S.C. 802(16)(B) .............................................................2

28 U.S.C. 1291 ..................................................................... ix

28 U.S.C. 1292(a)(1) ............................................................ ix

28 U.S.C. 1331 ..................................................................... ix

46 U.S.C. 40102(26) ............................................................39

Agricultural Act of 2014
  Pub. L. No. 113-79, sec. 7606, 128 Stat. 649, 912 (2014) ...................2

Agriculture Improvement Act of 2018
  Pub. L. No. 115-134, sec. 10114(b), codified at 7 U.S.C 1639*o* note,
  132 Stat. 4490, 4914 (2018)................................. 11, 29, 34

2023 Ark. Laws Act 629 (S.B. 358) ........................................7

Act 629 sec. 2 ........................................................................7

Act 629 sec. 6 ........................................................................7

Act 629, sec. 7 ..................................................................7, 11

Act 629, sec. 17 ....................................................................8

Act 629, sec. 20 ....................................................................7

Ark. Code Ann. 1-2-303(d)(1)(D) .........................................8

Ark. Code Ann. 2-15-503(5)........................................ 7, 20-21

Ark. Code Ann. 5-64-215(a)(5) ...................................... 23, 40

Ark. Code Ann. 5-64-215(a)(5)(A)(i) ....................................41

Ark. Code Ann. 5-64-215(a)(5)(A)(i)(e) ...............................24

Ark. Code Ann. 5-64-215(a)(5)(A)(i)(f)................................24

Ark. Code Ann. 5-64-215(a)(5)(A)(i)(g) ..................................................24

Ark. Code Ann. 5-64-215(a)(5)(A)(i)(h) ..................................................24

Ark. Code Ann. 5-64-215(a)(5)(A)(i)(i) ................................... 7, 23, 25

Ark. Code Ann. 5-64-215(a)(5)(A)(i)(j) ...................................................41

Ark. Code Ann. 5-64-215(d) ............................................................ 7-8, 34

Ark. Code Ann. 16-21-149(a) ................................................................46

Ark. Const. amend. 21, sec. 1 .................................................................46

Ark. Const. art VI, sec. 2 .........................................................................45

Ark. Const. art. VI, sec 7 .........................................................................45

Ind. Code 35-48-4-10.1(c) ......................................................................35

## Regulations

Ark. Dep't of Agric., *Ark. Dep't of Agric. Industrial Hemp Production Plan*,
    https://tinyurl.com/ark-hemp-plan ........................................................6

Dep't of Agric. Final Rule, *Establishment of a Domestic Hemp Production
    Program*, 86 Fed. Reg. 5,596  (Jan. 19, 2021) ..................................33

Drug Enf't Admin., *Schedules of Controlled Substances: Temporary
    Placement of Mitragynine and 7-Hydroxymitragynine into Schedule I*,
    81 Fed. Reg. 59,929 (Aug. 31, 2016) ................................................29

## Other Authorities

Letter from Terrence L. Boos, Drug & Chem. Evaluation Section Chief,
    Drug Enf't Admin., to Rod Kight (Feb. 13, 2023),
    https://tinyurl.com/Kight-letter .........................................................24

Ctrs. for Disease Control & Prevention, *Increases in Availability of Cannabis
    Products Containing Delta-8 THC and Reported Cases of Adverse Events*
    (2021), https://tinyurl.com/cdc-delta-8 ..................................... 2, 4, 5

Ctrs. for Disease Control, *About synthetic cannabinoids* (2021),
    https://www.cdc.gov/nceh/hsb/chemicals/sc/About.html ...................5

Dep't of Agric., *Status of State and Tribal Hemp Production
    Plans for USDA Approval*, https://tinyurl.com/hemp-plan-status .......................6

Elicia Dover, KATV, *What's causing the rise in Arkansas kids ingesting THC products?*, Mar. 2, 2023, https://tinyurl.com/kids-ingesting-THC..............7

Mitch McCoy, Fox16, *Loophole getting Arkansans high off chemically -altered marijuana product*, Feb. 27, 2023, https://tinyurl.com/delta-8-loophole .................................................................42

Marit S. Tweet et al., *Pediatric Edible Cannabis Exposures and Acute Toxicity*, 151:2 Pediatrics (2023).........................................................................6

Random House Webster's Unabridged Dictionary (2d ed. 2001)................... 40, 41

## STATEMENT OF JURISDICTION

The district court had original jurisdiction under 28 U.S.C. 1331. This Court has appellate jurisdiction over Defendants' appeal from its preliminary-injunction order under 28 U.S.C. 1292(a)(1), and has jurisdiction under 28 U.S.C. 1291 and the collateral order doctrine over Defendants' appeal from its denial of Defendants' motion to dismiss, on grounds of sovereign immunity, the Governor and Attorney General from this suit, *see McDaniel v. Precythe*, 897 F.3d 946, 949 (8th Cir. 2018). The district court entered its order granting Plaintiffs a preliminary injunction on September 7, 2023, and typographically corrected that order on September 8, 2023; this appeal was timely filed on October 6, 2023.

## STATEMENT OF THE ISSUES PRESENTED

Whether the district court erred in preliminarily enjoining the enforcement of Act 629 on the ground that it is likely preempted and void for vagueness.

Apposite Authority: *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) (en banc); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001); *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 548 (7th Cir. 2020); 7 U.S.C. 1639p(a)(3)(A); *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951 (8th Cir. 2019).

Whether the district court erred in holding that Arkansas's Governor and Attorney General do not have sovereign immunity from this suit.

Apposite Authority: *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952 (8th Cir. 2015).

## STATEMENT OF THE CASE

### A.    Federal Regulation of Marijuana and Hemp

Nearly a century ago, in response to its intoxicating effects, Congress effectively banned marijuana.  Congress first regulated marijuana, in 1937, by imposing punishing taxes on its transfer—$100 per ounce, the equivalent of thousands of dollars in today's money.  *See Smith v. United States*, 269 F.2d 217, 219-20 (D.C. Cir. 1959).  In 1970, Congress repealed the 1937 tax statute and replaced it with a more straightforward criminal ban on the production, sale, or possession of marijuana as part of the Controlled Substances Act.  *See N.H. Hemp Council, Inc. v. Marshall*, 203 F.3d 1, 7 (1st Cir. 2000).  With one key exception, that ban continues to be part of federal law today.

The 75th Congress, in a definition carried forward into the Controlled Substances Act, *see id.*, defined marijuana as the plant *Cannabis sativa* and any part of it, with the exception of its mature stalks, or oil or cake derived from the plant's seeds.  *Id.* (citing 21 U.S.C. 802(16) (2000)).  That definition, and its exceptions, tracked what scientists then understood about which parts of the plant contained the chemical that gives cannabis its psychoactive effects: tetrohydrocannabinol, or THC.  *See United States v. Walton*, 514 F.2d 201, 203 (D.C. Cir. 1975).  Over time, however, farmers and others discovered that it was possible to grow cannabis with very low levels of THC.  *See Monson v. Drug Enf't Admin.*, 589 F.3d 952,

955-57 (8th Cir. 2009). But even that low-THC cannabis remained a controlled substance under federal law. *See id.* at 961-62.

In 2014, Congress began to legalize the production of low-THC cannabis on an experimental basis. In what was popularly known as the 2014 Farm Bill, Congress allowed institutions of higher education and state agricultural departments to grow "industrial hemp"—defined as *Cannabis sativa* with no more than 0.3% delta-9 THC—for research purposes. Agricultural Act of 2014, Pub. L. No. 113-79, sec. 7606, 128 Stat. 649, 912 (2014). Delta-9 THC is one of a number of isomers of THC, and the one that occurs in the largest quantities in cannabis. *See* Ctrs. for Disease Control & Prevention, *Increases in Availability of Cannabis Products Containing Delta-8 THC and Reported Cases of Adverse Events* (2021), https://tinyurl.com/cdc-delta-8.

In 2018, this experiment accelerated. The 2018 Farm Bill modified the definition of marijuana in the Controlled Substances Act to exclude "hemp" and thereby—at the federal level—legalized hemp. Agriculture Improvement Act of 2018, Pub. L. No. 115-334, sec. 12619, 132 Stat. 4490, 5018 (2018), codified at 21 U.S.C. 802(16)(B). Congress defined hemp more broadly than in the 2014 Farm Bill, including not just cannabis plants with 0.3% delta-9 THC or less, but "any part of that plant" with that delta-9 THC level, including "all derivatives, extracts [and] cannabinoids." 7 U.S.C. 1639*o*(1).

However, to ensure cannabis growers didn't grow cannabis with THC that exceeded the federal limit under the guise of growing hemp, Congress heavily regulated hemp production. The Department of Agriculture could regulate, *see* 7 U.S.C. 1639q(a)(1), or States could, *see id.*, 1639p(a)(1). If a State chose to assume "primary regulatory authority over the production of hemp" in its territory, *id.*, it had to submit a plan for "monitor[ing] and regulat[ing] that production" to the Department of Agriculture for its approval, *id.* State plans would have to satisfy a variety of minimum requirements—all geared towards preventing production of cannabis with THC over the federal limit. *See id.*, 1639p(a)(2)(A) ("A State . . . plan . . . shall only be required to include . . . .").

But beyond satisfying that regulatory floor, a state plan for regulating hemp could be as stringent as a State chose. Indeed, to dispel any doubts about the ability of states to continue regulating hemp, the 2018 Farm Bill included a clause labeled "No preemption" that provided "[n]othing in th[e] subsection" concerning state plans for regulating hemp "preempts or limits the law of any State . . . that--(i) regulates the production of hemp; and (ii) is more stringent than this subchapter." *Id.*, 1639p(a)(3)(A). And even if a State opted to let the Department of Agriculture regulate hemp in its state, more stringent state regulation of hemp still would not be preempted; Congress specified that in such a State, hemp production would be

legal so long as "the production of hemp was not otherwise prohibited by the State." *Id.*, 1639p(f)(2).

## B. The Effects of Federal Hemp Legalization

In setting the legal level of delta-9 THC in cannabis at 0.3% or less, Congress believed it was only allowing certain cannabis products to reach the marketplace. But unfortunately, by defining hemp solely in terms of the most common naturally occurring form of THC, it created an opportunity for cannabis producers to claim Congress had inadvertently legalized synthesized forms of other THCs that were just as psychoactive.

For example, delta-8 THC exists naturally in cannabis in "only small quantities." Ctrs. for Disease Control, *supra*. Cannabidiol, or CBD, on the other hand—a non-psychoactive cannabinoid today found in a plethora of products—exists in cannabis in much higher quantities. *Id.* CBD and THC, however, are extremely similar molecules, related to each other in cannabis's metabolic process. App. 336; R. Doc. 64, at 3 ¶ 9. So merely by applying a solvent, an acid, or even heat to CBD, manufacturers can produce a synthetic form of delta-8 THC. Ctrs. for Disease Control, *supra*. And that form of THC has much the same psychoactive effects as its more common counterpart.

Indeed, illustrating the danger, in just one six-month span in 2021, 660 adverse reactions to delta-8 THC were reported to national poison control centers;

18% off which required hospitalization; and 39% of which involved children. *Id.* Two children, for example, ate their parents' delta-8 THC candy-looking gummies and, as a result, ended up in an intensive care unit, suffering from deep sedation, slowed heart rate, and decreased blood pressure. *Id.*

Since the enactment of the 2018 Farm Bill, the Drug Enforcement Administration has consistently explained that such synthetic forms of THC remain controlled substances, regardless of their concentration of delta-9 THC. As the DEA has explained, because the 2018 Farm Bill only legalized cannabis plants and parts of those plants with 0.3% delta-9 THC or less, synthetically created THCs, which are not part of the cannabis plant, are not "hemp" under federal law. *See* App. 124, 128; R. Doc. 43-2, at 1, 5.

But that has not deterred unscrupulous actors from manufacturing synthetic THC. To the contrary, there are now hundreds of synthetic cannabinoids on the market. Ctrs. for Disease Control, *About synthetic cannabinoids* (2021), https://www.cdc.gov/nceh/hsb/chemicals/sc/About.html. These products range from vapes filled with THC acid, which converts to delta-9 THC when heated, *see* R. Doc. 68-1, at 31-33 (submission of Cannabis Regulators Association to Congress), to cigarettes, gummies, candies, and seltzers infused with high levels of delta-8 and other synthesized THCs, *id.* at 37-40. Many of these dangerous products are specifically marketed to children, mimicking popular children's brands of

cereal or candy: a "Sticky Charms" cereal purporting to contain 500 milligrams of "hemp-derived" delta-8 THC; a "Jolly HHC" vape; a "Nrds" gummy with 100 milligrams of THC per gummy. *Id.* at 41.

Sadly, that strategy has succeeded, and those products have reached and sickened countless children. One recent study in the journal of the American Academy of Pediatrics, for instance, found over three thousand reported exposures of children *under six* years old to edible cannabis products in 2021, a nearly fifteen-fold increase from only four years prior, and a 23% hospitalization rate of children under six exposed. Marit S. Tweet et al., *Pediatric Edible Cannabis Exposures and Acute Toxicity*, 151:2 Pediatrics (2023).

### C.    Arkansas Regulation of Hemp and Synthetic Cannabinoids

Arkansas was one of the States that opted to assume regulatory authority over hemp production under the 2018 Farm Bill. On November 2, 2021, it submitted its hemp production plan to the Department of Agriculture, Ark. Dep't of Agric., *Ark. Dep't of Agric. Industrial Hemp Production Plan*, https://tinyurl.com/ark-hemp-plan, and the Department of Agriculture approved it, Department of Agriculture, *Status of State and Tribal Hemp Production Plans for USDA Approval*, https://tinyurl.com/hemp-plan-status. But Arkansas found that the minimum set of regulations required by federal law was inadequate to protect its citizens (and particularly its children). Like the rest of the country, Arkansas saw a

surge in sales of synthetic THC products—and in the numbers of children sickened by them. The chief pediatrician at Arkansas Children's Hospital, for example, estimated in early 2023 that thirty to forty-five children were hospitalized per year at his hospital alone for complications from a THC overdose. Elicia Dover, KATV, *What's causing the rise in Arkansas kids ingesting THC products?*, Mar. 2, 2023, https://tinyurl.com/kids-ingesting-THC.

Responding to "the absence of proper regulation" of synthetic THCs, 2023 Ark. Laws Act 629 (S.B. 358) sec. 20, in 2023, the Arkansas General Assembly enacted Act 629. It contains three key provisions. First, it added a list of synthetic THCs to Arkansas's list of controlled substances. As relevant here, that list included delta-9 THC in the event it was not extracted from cannabis but was produced by "a synthetic chemical process that converted . . . a substance contained in the industrial hemp" into that THC. Act 629 sec. 6, codified at Ark. Code Ann. 5-64-215(a)(5)(A)(i)(i). Second, it amended Arkansas's definition of hemp, which otherwise mirrored the 2018 Farm Bill's, to clarify that the federal definition's 0.3% delta-9 THC limit applied to "hemp-derived [CBD]." *Id.*, sec. 2, codified at Ark. Code Ann. 2-15-503(5). Third, it made clear that none of its prohibitions on the possession or manufacture of synthetic THCs prohibited "the continuous transportation through Arkansas" of hemp as defined in federal law. *Id.*, sec. 7, codified at Ark. Code Ann. 5-64-215(d).

In addition to these provisions, Act 629 contained a number of fallback provisions, to take effect only if the State were enjoined from enforcing the provisions described above. *Id.*, sec. 17. The cross-reference to those provisions, however, contained a scrivener's error; an amendment to the bill added two new sections, changing the bill's numbering, but the effective date section wasn't updated accordingly. App. 130; R. Doc. 43-3, at 1 (Arkansas Bureau of Legislative Research staff notes). In codifying Act 629, the Arkansas Code Revision Commission, which under state law is authorized to "[c]orrect manifest errors in references to laws," Ark. Code Ann. 1-2-303(d)(1)(D), corrected the effective-date clause's cross-reference to Sections 6 to 14, which reflected the original bill's numbering, to a cross-reference to Sections 8 to 16. App. 151; R. Doc. 43-5, at 2. The practical upshot of that correction was to make the bill's interstate transportation saving clause, Section 7, effective immediately. Accordingly, the Code Revision Commission codified that section. *See* Ark. Code Ann. 5-64-215(d).

### D.     Factual and Procedural Background

On July 31, 2023, two months after Act 629's passage, four LLCs and corporations that farm, distribute, and sell hemp and ostensibly hemp-derived products at retail sued to enjoin the enforcement of Act 629. R. Doc. 1, at 4-5 ¶¶ 11-14. They named as parties the State of Arkansas itself, its Governor and its Attorney General, 23 Prosecuting Attorneys for the State's various judicial districts, and the

four state agencies that played some role in enforcing Act 629.  *Id.* at 5-11 ¶¶ 15-49.  They variously claimed that the 2018 Farm Bill preempted Act 629 by mandating that States legalize hemp as defined in federal law, *id.* at 19-21 ¶¶ 83-93; that Act 629 violated the dormant Commerce Clause, *id.* at 22 ¶ 97; that it constituted a regulatory taking, *id.* at 23-24 ¶¶ 102-06; and that it was void for vagueness because it did not define such terms as "psychoactive substance," *id.* at 24-26 ¶¶ 109-14.  On the same date, Plaintiffs moved for a temporary restraining order, or in the alternative a preliminary injunction.  App. 6-7; R. Doc. 2, at 1-2.

Defendants opposed Plaintiffs' motion for injunctive relief.  R. Doc. 38.  They also moved to dismiss the State, its agencies, and the Governor and Attorney General on the basis of sovereign immunity, arguing that sovereign immunity flatly barred suit against the State and its agencies, and that the Governor and Attorney General were not proper *Ex parte Young* defendants because they did not enforce Act 629.  *Id.*  Plaintiffs responded by filing an amended complaint that removed the State and its agencies as defendants, but left in the Governor and Attorney General.  App. 239-44; R. Doc. 51, at 6-11 ¶¶ 16-49.

After a three-hour hearing and brief presentation of evidence, the district court enjoined all the remaining defendants from enforcing Act 629.  The district court first denied Defendants' motion to dismiss the Governor and Attorney General.  Add. 8-9; App. 349-50; R. Doc. 65-1, at 8-9.  The district court reasoned only

that under the State Constitution "the Governor has a responsibility as chief executive for the enforcement of the criminal laws of the state," Add. 8; App. 349; R. Doc. 65-1, at 8, and that the Attorney General "has a specific role in Act 629" because Act 629's fallback provisions only become effective upon his certification that its primary provisions are enjoined, Add. 9 & n.38; App. 350 & n.38; R. Doc. 65-1, at 9 n.38.

Turning to Plaintiffs' preliminary-injunction motion, the district court held that Act 629 was likely both conflict-preempted and expressly preempted by the 2018 Farm Bill, and that it was likely void for vagueness. Add. 9-16; App. 350-57; R. Doc. 65-1, at 9-16. Yet in making that determination, the district court did not determine whether Plaintiffs had made—as this Court's precedent requires to preliminarily enjoin a duly enacted state law—a "more rigorous showing" than usual "that [they were] likely to prevail on the merits." *Planned Parenthood of Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 957-58 (8th Cir. 2017) (citing *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) (en banc)). Indeed, the district court failed to even acknowledge that standard.

The district court first concluded that Act 629's definition of hemp and list of prohibited synthetic THCs were likely more restrictive than federal law. As to the definition of hemp, the district court focused on its reference to hemp-derived CBD, apparently interpreting the definition to turn in every case on whether a plant

10

or product's *CBD content*, rather than the plant or product overall, was 0.3% delta-9 THC or less.  Add. 12; App. 353; R. Doc. 65-1, at 12.  It then concluded that the synthetic THCs prohibited by Act 629 were "likely legal under the 2018 Farm Bill," *id.*, claiming that the federal definition of hemp "does not limit its application to [the] method" by which so-called hemp products are produced. Add. 13; App. 354; R. Doc. 65-1, at 13.  Under the district court's interpretation, substances derived "through a completely synthetic process" are hemp under federal law so long as they are, at minimum, "molecularly the same" as hemp.  Add. 14; App. 355; R. Doc. 65-1, at 14.

Having concluded that Act 629 was more restrictive than the 2018 Farm Bill, the district court concluded in a paragraph that meant it was likely conflict-preempted by the 2018 Farm Bill.  Though the district court acknowledged that under that law's anti-preemption clause, Arkansas "[c]learly . . . can regulate hemp production and even ban it outright," Add. 14; App. 355; R. Doc. 65-1, at 14, it said that Arkansas could not "chang[e] definitions in a federal program" or "keep the parts of the program it likes . . . and eliminate the parts it doesn't," *id.*  The district court did not explain what program it had in mind or what in the 2018 Farm Bill or preemption law prohibited Arkansas from only partially adhering to that program.

Turning to express preemption, the district court noted that the 2018 Farm Bill expressly preempts state prohibitions on the interstate transportation of hemp. Add. 15; App. 356; R. Doc. 65-1, at 15 (citing Pub. L. No. 115-134, sec. 10114(b)). It acknowledged that Section 7 of Act 629, which it initially incorrectly suggested was not yet effective, Add. 16; App. 357; R. Doc. 65-1, at 16, "attempts to address the interstate commerce issue," *id.* Yet the district court concluded that "attempt" was "ineffective," *id.*, because it was not sure whether Section 7's carve-out for "continuous transportation" would exempt an employee transporting hemp who stopped for gas, *id.*

Finally, the district court held that several terms in Act 629 were likely void for vagueness. Add. 16; App. 357; R. Doc. 65-1, at 16. That included "continuous transportation," as well as "synthetic substance" and "psychoactive substance." *Id.* The district court reasoned only that those terms were "not defined in the statute," *id.*; it did not address whether their surrounding context or canons of interpretation clarified their meaning, nor whether their ordinary meaning was vague.

Turning to the remaining preliminary-injunction factors, which it addressed in a single page, the district court reasoned only that the threat of criminal sanctions and lost profits that could not be easily measured amounted to irreparable harm, that "[p]otential harm to Defendants is negligible," and that "[t]he public does not have an interest in the enforcement of a statute" that the district court had

concluded was likely unconstitutional.  Add. 17; App. 358; R. Doc. 65-1, at 17.

The district court said not a word about the serious health and safety harms to children and others that motivated Act 629's enactment.

Defendants timely appealed the district court's order on October 6, 2023, and moved the district court to stay its order pending appeal on the same date.  The district court denied the stay motion in a docket entry.  App. 5; R. Doc. 72.

## STANDARD OF REVIEW

This Court reviews district court determinations of sovereign immunity de novo. *See Balogh v. Lombardi*, 816 F.3d 536, 544 (8th Cir. 2016). It generally reviews preliminary injunctions for abuse of discretion, but "[w]hen purely legal questions are presented, however," as here, "this [C]ourt owes no special deference to the district court" and reviews its legal determinations de novo. *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1021 (8th Cir. 2015) (reviewing a preemption-based injunction).

The underlying preliminary-injunction standard requires Plaintiffs to make a "clear showing" that each preliminary-injunction factor favors them. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). And on the likelihood-of-success factor, Plaintiffs were required to make a "more rigorous showing" than usual "that [they were] likely to prevail on the merits" in order to obtain an injunction blocking enforcement "of a duly enacted state statute." *Planned Parenthood of Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 957-58 (8th Cir. 2017) (citing *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) (en banc)).

## SUMMARY OF THE ARGUMENT

The district court erred at every step in its preliminary-injunction order and decision denying Defendants' motion to dismiss the Governor and Attorney General as immune from suit. And each and every error is a basis for reversal and dismissal of this case.

First, the district court's holding that Plaintiffs were likely to succeed on their preemption claims was based on its conclusion that Act 629 defines hemp more narrowly than federal law. That is not the case. Act 629, to be sure, clarifies ambiguities in federal law, but before Act 629 was ever enacted, federal law banned both hemp-derived CBD with more than 0.3% delta-9 THC, and synthetic THCs. Synthetic THCs are not a "part of" the cannabis plant, so they are not hemp under the federal definition no matter their delta-9 THC level. Hemp-derived CBD extracts, by contrast, are parts of the plant, and, as under Act 629, are not hemp if their delta-9 THC level exceed 0.3 percent. As for the district court's suggestion that Act 629's definition always turns on the level of delta-9 THC in a product's CBD, that reading of the statute is nonsensical because the two are different chemicals and cannot be found in each other.

Second, even if Act 629 did regulate hemp more stringently than federal law, it would not be conflict-preempted by the 2018 Farm Bill because that law expressly provides that States may regulate hemp more stringently than federal law

does.  The district court recognized that's normally the law, but it said that wasn't true where States participate in the federal hemp production program.  But that claim conflicts with that fact that both the 2018 Farm Bill and the Department of Agriculture's regulations implementing that program provide that a state's participation in the program does not preempt more stringent state regulation.  Indeed, the district court only concluded the contrary by overlooking the fact that the Farm Bill disclaims any preemptive effects from the program, not just the bill generally.

Third, the district court said Act 629 violated the Farm Bill's express preemption of prohibitions on interstate hemp transportation because the phrase "continuous transportation" was insufficient to carve out transportation with stops for sleep or gas.  But as any number of cases from this Court, the Supreme Court, and other courts hold, the phrase "continuous transportation" embraces transportation with far longer stops than that.  And even if the phrase were ambiguous, Arkansas's canon of constitutional avoidance, and the transportation saving clause's obvious intent, would mandate a reading that avoided preemption.

Fourth, the district court held Act 629 was void for vagueness because it used three undefined terms.  The district court overlooked the context in which those terms appear, which clarifies their meaning; the phrase "synthetic substance," for example, merely prefaces a list of specific synthetic substances.  And it

also did not consider whether those terms have ordinary meanings in law or science, as in fact they do. There is no vagueness problem with Act 629.

Fifth, in weighing the harms to the parties of granting or denying injunctive relief, the district court considered only Plaintiffs' purported harms and completely ignored the health and safety harms to Arkansans (and particularly children) from leaving synthetic THCs unregulated, and flatly denying that Arkansas had any interest in the enforcement of Act 629. That too was error. An analysis that considered Arkansas's harms would have concluded that the balance of harms easily weighs heavily in Defendants' favor.

Sixth, in holding that the Governor and Attorney General were proper *Ex parte Young* defendants, the district court simply ignored this Court's precedent that a governor's general law-enforcement authority is an insufficient basis for suit. And it conflated the Attorney General's role in advising others about whether Act 629 is enforceable or has been enjoined with actually enforcing that provision. Only a role in enforcing the law—not in advising those who do on its constitutionality—is a basis for suit under *Ex parte Young*.

# ARGUMENT

## I. The district court's preliminary injunction should be reversed because Plaintiffs cannot succeed on the merits of their claims.

### A. The district court failed to apply the proper legal standard.

The district court merely held that Plaintiffs were likely to succeed on the merits of their claims. But that's not the proper merits inquiry. Instead, where a plaintiff's requested relief would prevent "implementation of a duly enacted state statute," Plaintiffs must make a "*more rigorous* showing" than usual "that [they are] 'likely to prevail on the merits.'" *Jegley*, 864 F.3d at 957-58 (emphasis added) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d at 732-33). Indeed, that burden "is a heavy one where, as here, granting the [requested relief] will give [them] substantially the relief [they] would obtain after a trial on the merits." *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991).

Yet the district court did not even acknowledge—let alone apply—that standard. That error infected every step of the district court's order, and at a minimum, that alone requires vacating the injunction.

### B. Plaintiffs cannot succeed on their various preemption claims.

The district court wrongly held that Act 629 was likely preempted for three reasons. First, it held that Act 629's definition of hemp and list of prohibited synthetic THCs were likely stricter than federal law. Second, it held that though Arkansas could generally regulate hemp more strictly than federal law, it could not do

18

so while accepting parts of an unspecified federal hemp program. Third, it held that even though Arkansas had tried to avoid express preemption by permitting the continuous transportation of hemp, as defined in federal law, through Arkansas, that attempt was a failure because the phrase "continuous transportation" might not include transportation with brief stops.

The district court erred on all three points. To start, Arkansas's definition of hemp and exclusions from that definition only make explicit what the federal government agrees federal law already says: that synthetically produced THCs are not hemp and not exempt from the Controlled Substances Act. Next, even if that were not the case, the 2018 Farm Bill expressly provides that States that participate in the federal hemp production program may regulate hemp more stringently than federal law. And lastly, Arkansas's carveout for continuous transportation easily covers transportation with brief stops, as caselaw interpreting that phrase confirms. Plaintiffs have no likelihood of success on their preemption claims, and this Court should reverse.

      1.    Act 629's definition of hemp is consistent with the federal definition of hemp.

The district court held Act 629 was likely preempted on two grounds. First, it was likely conflict-preempted because Arkansas could not define hemp more narrowly than federal law does. Second, it was likely expressly preempted because

Act 629 supposedly prohibited the interstate transportation of substances that federal law deems hemp but that fall outside Arkansas's supposedly more narrow definition. But the assumption underlying both holdings is that Act 629 defines hemp more narrowly than federal law. If that is incorrect, there is no preemption on either theory. And that assumption is incorrect. Act 629 merely clarifies federal law's exclusion of substances that so-called hemp producers may claim federal law deems hemp, but that federal law in fact does not.

> a. Act 629's definition of hemp is consistent with federal law's definition of hemp.

Federal law's definition of "hemp" is simple. It defines "hemp" as "the plant Cannabis sativa L. and any part of that plant," including "all derivatives, extracts, [and] cannabinoids" from that plant, "with a delta-9 [THC] concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. 1639*o*(1). Act 629's definition of hemp is also simple. It too defines hemp as "the plant Cannabis sativa and any part of the plant," including "all derivatives, extracts, [and] cannabinoids" from that plant, "with a total delta-9 [THC] concentration of no more than three-tenths of one percent." Ark. Code Ann. 2-15-503(5). The only difference between Act 629's definition and the federal definition is that Act 629 specifies

that no more than 0.3% of "hemp-derived cannab[i]diol"[1] may be delta-9 THC as well. *Id.*

That clarification is not inconsistent with the federal definition of hemp. That definition applies not only to the cannabis plant itself, but to any of its derivatives and extracts, including its cannabinoids; none of those derivatives may be more than 0.3% delta-9 THC. Hemp-derived cannabidiol, or CBD, is one such cannabinoid. So under the federal definition, CBD, like the plant from which it is derived, may not be more than 0.3% delta-9 THC. Act 629 merely spells out that the 0.3% delta-9 THC rule applies to CBD extracts.

The district court, however, appears to have read Act 629 to limit hemp to plants and products, whether CBD extract or not, whose CBD contents are no more than 0.3% delta-9 THC. *See* Add. 12; App. 353; R. Doc. 65-1, at 12. For example, under the district court's reading, to tell if a cannabis plant is hemp, a chemist would first isolate its "hemp-derived cannabidiol," then determine whether 0.3% or more of it is delta-9 THC. As both Plaintiffs' and Defendants' experts explained, that reading makes no sense and cannot be what Act 629 means. Delta-9 THC and CBD are "[t]wo different molecules that are not the same thing." Tr. 39:21 (Plaintiffs' expert); *see also* App. 336; R. Doc. 64, at 3 (same) (Defendants' expert). A

---

[1] The statute refers to "cannabadiol," *id.*, a spelling error for "cannabidiol," as the district court implicitly recognized, *see* Add. 11; App. 352; R. Doc. 65-1, at 11 (correcting the error).

chemist can measure what percentage of a product marketed as CBD extract is actually THC residue, in the same way a chemist can measure what percentage of a pill marketed as a vitamin C supplement is actually some other vitamin. But it "makes no sense at all" to ask what percentage of the CBD in a plant is delta-9 THC, any more than it makes sense to ask what percentage of the vitamin C in a carrot is vitamin D. Tr. 39:14. The answer is always zero because CBD cannot be THC.

A critical contextual clue that the Arkansas General Assembly did not intend that absurd reading is that Act 629's definition of hemp refers to "hemp-derived [CBD]," not to CBD generally. That language assumes that the CBD in question derives from hemp in the first place. Yet if Arkansas's test for whether any cannabis plant or product was hemp was whether its hemp-derived CBD was 0.3% delta-9 THC, that would make the definition circular. To tell whether a plant was hemp, one would first need to know whether its CBD was "hemp-derived," which would depend on whether the plant was hemp in the first place. That is an impossible reading of the statute. The far better and only workable reading is that the insertion of "hemp-derived [CBD]" merely clarifies that, when CBD *is* derived from hemp, that CBD extract, like the hemp plant itself, may be no more than 0.3% delta-9 THC by weight. That clarification only spells out what the federal hemp

definition's general reference to extracts and cannabinoids implies.  Arkansas's and federal law's definitions of hemp are the same.

b.      Act 629's list of synthetic THCs is consistent with the federal definition of hemp.

In addition to defining hemp generally, Act 629 contains a list of "synthetic substances" that are not to be deemed hemp under Arkansas law.  Ark. Code Ann. 5-64-215(a)(5).  Each is a synthetic THC, *see id.*, "produced as a result of a synthetic chemical process," *id.*, -(a)(5)(A)(i)(i).  The district court held that these enumerated synthetic THCs were "likely legal" under federal law.  Add. 12; App. 353; R. Doc. 65-1, at 12.  It reasoned that, on its reading of federal law, chemicals that are created by "a completely synthetic process," Add. 14; App. 355; R. Doc. 65-1, at 14, even if they do not naturally occur in cannabis, are legalized hemp so long as "they do not cross the 0.3 percent delta-9 THC threshold," Add. 13; App. 354; R. Doc. 65-1, at 13.  As the Drug Enforcement Administration has confirmed, that reading is mistaken; synthetic substances are not hemp even if they molecularly resemble chemicals contained in hemp.

The federal definition of hemp legalizes the cannabis plant, "and any part of that plant," including "derivatives" and "extracts," so long as the plant or part thereof is no more than 0.3% delta-9 THC.  7 U.S.C. 1639*o*(1).  Any number of controlled substances fall below that threshold—cocaine doesn't contain THC, but affects the mind via other psychoactive chemicals—but if they are not a "part of

[the cannabis] plant" in the first place, they are not legalized hemp.  A chemical created by "a completely synthetic process," Add. 14; App. 355; R. Doc. 65-1, at 14, like the "synthetic substances" enumerated in Act 629, is not "a part of that plant."  It may resemble chemicals derived from cannabis plants, or even, as the district court suggested, be "molecularly the same" as a substance derived from a cannabis plant, *id.*, but it isn't a part of one.

The DEA has repeatedly explained that is what the 2018 Farm Bill says, specifically addressing many of the substances prohibited by Act 629.  Beginning with the easiest case, earlier this year the DEA clarified that the federal definition of hemp does not include THC acetate esters, a number of which are prohibited by Act 629.  *See* Ark. Code Ann. 5-64-215(a)(5)(A)(i)(e)-(h).  Those substances, it explained, "do not occur naturally in the cannabis plant and can only be obtained synthetically, and therefore do not fall under the definition of hemp."  Letter from Terrence L. Boos, Drug & Chem. Evaluation Section Chief, Drug Enf't Admin., to Rod Kight (Feb. 13, 2023),  https://tinyurl.com/Kight-letter.  Instead, they merely "hav[e] similar chemical structures . . . to those contained in the cannabis plant."  *Id.*

Next, there is the case of substances that are "contained in the [cannabis] plant . . . and also can be produced synthetically from non-cannabis materials," such as delta-8 or delta-9 THC.  App. 128; R. Doc. 43-2, at 5.  Arkansas bans such

24

substances, irrespective of delta-9 THC concentration, to the extent that they are "produced as a result of a synthetic chemical process." Ark. Code Ann. 5-64-215(a)(5)(A)(i)(i). Here too, the DEA draws the line between actual extracts from cannabis plants and synthetic substances. Regardless of delta-9 THC concentration, if a THC that naturally occurs in cannabis is "synthetically produced from non-cannabis materials," it is "controlled under the CSA." App. 128; R. Doc. 43-2 at 5 (correspondence from DEA to Arkansas Department of Agriculture). That is so, DEA explained, because federal law only defines parts of the cannabis plant as hemp. *Id.* n.1; *see also AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 692-93 (9th Cir. 2022) (reaching the same conclusion).

Finally, there is the case of THCs that naturally occur in cannabis, but are produced by synthesizing some cannabis-derived chemical, such as CBD, into another chemical, such as delta-9 THC. Here too, Act 629 says that irrespective of delta-9 THC concentration, the use of "a synthetic chemical process that converted . . . a substance contained in the industrial hemp" into a THC makes the end product prohibited. Ark. Code Ann. 5-64-215(a)(5)(A)(i)(i). And here too, the DEA agrees that such synthetic substances are prohibited by federal law as well. In correspondence with the Arkansas Department of Agriculture, the DEA's Drug and Chemical Evaluation Section Chief explained that arriving at a THC "by a chemical reaction starting from CBD makes [that THC] synthetic and therefore, not

exempted by the [Farm Bill].  Any quantity of [THC] obtained by chemical means is a controlled substance."  App. 124; R. Doc. 43-2 at 1.  By contrast, if the same THC "is extracted from the plant," not produced by chemical reaction from other chemicals, it is "exempted" if it is below 0.3% delta-9 THC.  *Id.*

That reading makes perfect sense.  A chemical may be produced from cannabis extracts.  But if that chemical didn't exist in the plant itself—and was only created by a chemical reaction from other chemicals that did—that chemical was never "a part of the plant."  Instead, it only came into being in a laboratory.

Accordingly, the district court erred in holding that Act 629 prohibited THCs that are likely legal under federal law.  Rather, it at most made more explicit what federal law already says: that synthetic THCs, however much they resemble the THCs that naturally occur in cannabis plants, are not hemp.  Therefore, Plaintiffs are not likely to succeed on either of their preemption claims, and this Court should reverse.

> 2.  Even if Arkansas's definition of hemp were more stringent than federal law's, Plaintiffs' conflict-preemption claim would still fail.

Act 629 doesn't prohibit anything that federal law does not already bar, and as such, it is not preempted.  But even if Act 629 did prohibit sales of hemp-derived products that federal law permits, it still wouldn't be preempted.  Federal law does not give hemp growers or dealers a right to sell hemp products; it merely

excludes hemp, as defined by federal law, from the list of substances that *federal law* controls. Indeed, the very law that Plaintiffs claim preempts Act 629's allegedly more stringent regulation of hemp says that it does not preempt more stringent state regulation of hemp. So whatever daylight exists between the federal and state definitions of hemp, Act 629 still isn't preempted.

The district court held that Act 629 was likely both conflict-preempted and expressly preempted, in that order. Add. 10-16; App. 351-57; R. Doc. 65-1, at 10-16. Conflict preemption, "which is a kind of implied preemption," *Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 887 (8th Cir. 2005), exists where "compliance with both federal and state laws is impossible," *Keller v. City of Fremont*, 719 F.3d 931, 940 (8th Cir. 2013), or where "a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *id.* (internal quotation marks omitted). Plaintiffs do not claim the former kind of conflict preemption, and for good reason; federal law does not mandate Plaintiffs sell hemp-derived products, so it's not impossible to comply both with Act 629 and federal law, whatever the overlap or discrepancy. Instead, they only claim—and the district court only held—that Act 629 somehow poses an obstacle to the achievement of Congress's purposes in legalizing hemp at the federal level.

In any obstacle-preemption case, "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Chamber of*

*Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (Roberts, C.J., plurality op.)

And "in areas of traditional state regulation," like the regulation of controlled sub-

stances, there is "a presumption against preemption" that is only "overcome if it

was the 'clear and manifest purpose of [Congress]'" to supersede state authority.

*Wuebker*, 418 F.3d at 887 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218,

230 (1947)); *see also, e.g.*, *CTS Corp v. Waldburger*, 573 U.S. 1, 18-19 (2014)

(same).

But in a case like this one, where Congress expressly spoke to preemption,

the burden is higher still.  When that's so, the Court's "task is to identify the do-

main expressly pre-empted, because 'an express definition of the pre-emptive

reach of a statute supports a reasonable inference that Congress did not intend to

pre-empt other matters.'"  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541

(2001) (alterations omitted) (citation omitted) (quoting *Freightliner Corp. v. My-

rick*, 514 U.S. 280, 288 (1995)).  Here, Congress not only enacted an express

preemption clause, but also enacted an express non-preemption clause specifying

the kinds of state law the 2018 Farm Bill did not preempt.  That left almost no

room for implied preemption.

The 2018 Farm Bill addresses the preemptive effects of its federal legaliza-

tion of hemp in two places.  It first provides that "[n]o State . . . shall prohibit the

transportation or shipment of hemp or hemp products produced in accordance with

[the bill] through the State." Pub. L. No. 115-134, sec. 10114(b), 132 Stat. 4490, 4914 (2018) (codified at 7 U.S.C. 1639*o* note). No other types of state regulation of hemp are expressly preempted. It then provides—in a clause entitled "No preemption"—that "[n]othing . . . preempts or limits any law of a State . . . that (i) regulates the production of hemp; and (ii) is more stringent than this subchapter." 7 U.S.C. 1639p(a)(3)(A).

That language is fatal to Plaintiffs' conflict preemption theory. For Plaintiffs to be correct, Congress would have to have intended to create an open nationwide market in hemp. Yet there is "nothing in the 2018 Farm Law that supports the inference that Congress was demanding that states legalize industrial hemp." *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 548 (7th Cir. 2020). Instead, Congress expressly said the opposite: that States may enact regulations of hemp that are "more stringent" than federal law, 7 U.S.C. 1639p(a)(3)(A)(ii), so long as that regulation is confined "within their own borders," *C.Y. Wholesale*, 965 F.3d at 548.

By saying so, Congress merely made express what is always true of federal controlled substance law. There are a number of "psychoactive drugs, such as salvia, which are not scheduled by the DEA but which some states nonetheless choose to criminalize." *Id.*[2] No one thinks that by declining to ban them at the

---

[2] *See also, e.g.*, Drug Enf't Admin., *Schedules of Controlled Substances: Temporary Placement of Mitragynine and 7-Hydroxymitragynine into Schedule I*, 81 Fed.

federal level, Congress has "preclude[d] their proscription" by States. *Id.*; *see also No. Va. Hemp & Agric. LLC v. Virginia*, — F. Supp. 3d —, 2023 WL 7130853, at *6 (E.D. Va. Oct. 30, 2023) ("If Congress chooses to make a substance . . . legal at the federal level . . . that does not mean that Congress has mandated that the substance must be legal in every state."). Rather, it has merely chosen not to adopt federal penalties for their possession or sale.

Accordingly, until the district court's decision below, every court to consider conflict-preemption claims like Plaintiffs' had either rejected them or was reversed on appeal for accepting them. The Seventh Circuit, in an opinion by Judge Wood joined by Judges Easterbrook and Kanne, held that the 2018 Farm Bill does not preempt States from regulating the production or possession of hemp more stringently than federal law, so long as they do not fall afoul of that law's express preemption of state laws that regulate interstate hemp transportation. *C.Y. Wholesale*, 965 F.3d at 548-59. In a recent opinion for the District Court for the Eastern District of Virginia, Judge Brinkema agreed with the Seventh Circuit that Congress's express disclaimer of preempting state regulation of hemp production—and its silence on state regulation of hemp possession or sale, contrasted with its express preemption of state regulation of hemp interstate transport—meant state bans

---

Reg. 59,929, 59,932 & n.27 (Aug. 31, 2016) (noting that six States and the District of Columbia ban kratom, though federal law does not).

of products defined as hemp under federal law were not conflict-preempted. *No. Va. Hemp & Agric.*, 2023 WL 7130853, at *8. And prior to that, both the District Courts for the Eastern District of California and the District of Hawaii reached the same conclusion. *See Free Spirit Organics, NAC v. San Joaquin Cnty. Bd. of Supervisors*, No. 2:17-CV-02271, 2022 WL 902834, at *4 (E.D. Cal. Mar. 25, 2022); *Duke's Invs. LLC v. Char*, Civ. No. 22-00385, 2022 WL 17128976, at *5-6 (D. Haw. Nov. 22, 2022). Each court upheld a state law that did not ban hemp entirely, but prohibited types of hemp that were removed from controlled substances law at the federal level.

The district court acknowledged that under the 2018 Farm Bill's savings clause, Arkansas can "[c]learly . . . regulate hemp production and even ban it outright if it is so inclined." Add. 14; App. 355; R. Doc. 65-1, at 14. Yet it held Arkansas's law was likely conflict-preempted on the ground that once Arkansas "got onboard" with an unnamed hemp "federal program," Arkansas could not "chang[e] definitions" of hemp in that program. *Id.*

What the district court meant by any of this is unclear; Plaintiffs did not brief this preemption-by-federal-program-participation theory. But as best as Defendants can discern, the district court apparently believed that once Arkansas assumed "primary regulatory authority over the production of hemp" in Arkansas, 7 U.S.C. 1639p(a)(1), and submitted its plan for regulating that production

consistently with federal law to the Department of Agriculture, Arkansas could no longer prohibit hemp production that federal law allowed. The fatal flaw in that theory is that the 2018 Farm Bill and the Department of Agriculture's regulations expressly reject it.

As discussed, the 2018 Farm Bill expressly states it does not preempt more stringent state regulation of hemp production than the level of regulation contained in the Farm Bill. The district court acknowledged this. And—while the district court didn't acknowledge it—that disclaimer is contained in the very section of the 2018 Farm Bill that addresses state participation in the federal hemp "program." Section 1639p(a) provides that States that want "primary regulatory authority over the production of hemp" may submit plans to the Department of Agriculture for regulating hemp production. 7 U.S.C. 1639p(a)(1). It then provides that "[n]othing in *this subsection*"—the very one providing for state regulation of hemp under federal oversight—preempts "more stringent" regulation of hemp production than federal law provides. *Id.*, 1639p(a)(3)(A) (emphasis added). That is, Congress anticipated that unscrupulous actors would argue that if States opted to regulate hemp under the Farm Bill, they would be preempted from regulating hemp more stringently than the Farm Bill did—and it responded with language making it clear that isn't the case.

Consistently with that language, the Department of Agriculture, which administers the federal hemp program, has authorized States that participate in that program to regulate hemp more stringently than federal law. In its final rule on the subject after the enactment of the 2018 Farm Bill, it said that state "plan[s] may provide for more stringent requirements" than federal law. Dep't of Agric. Final Rule, *Establishment of a Domestic Hemp Production Program*, 86 Fed. Reg. 5,596, 5,648 (Jan. 19, 2021). Then, responding to commenters who complained the Department's proposed rule would allow over-restrictive state plans, the Department wrote that "[t]he 2018 Farm Bill expressly preserved the ability for State . . . hemp production plans to establish additional provisions stricter than the baseline regulations required by the 2018 Farm Bill." *Id.* at 5,657. Under the Department's interpretation, the only way in which state plans must match federal law is to satisfy its "minimum requirements," *id.*, which act as a floor, not a ceiling.

The district court's error, then, was fundamental. It theorized that while States may normally regulate hemp more stringently than federal law, if they opt to participate in the federal hemp production program, they may not regulate hemp any more stringently than federal law does. But the statute creating that program, and the rules of the agency administering it, say exactly the opposite: that a State's very participation in the program may consist of a regulatory regime that is more

stringent than what federal law requires. Plaintiffs therefore have no likelihood of success on their conflict-preemption claim, and this Court should reverse.

3. Even if Arkansas's definition of hemp were more stringent than federal law's, Plaintiffs' express-preemption claim would still fail.

The 2018 Farm Bill does expressly preempt one kind of state regulation of hemp: state laws that "prohibit the transportation or shipment of hemp or hemp products produced in accordance with [federal law] through the State." 7 U.S.C. 1639*o* note. Because Act 629 only prohibits the production or possession of substances that federal law doesn't deem hemp, that clause cannot preempt Act 629. But even if Act 629 did define hemp more narrowly than federal law, Act 629's interstate transportation savings clause would save Act 629 from preemption.

Section 7 of Act 629 provides that the Act "does not prohibit the continuous transportation through Arkansas" of hemp, copying verbatim the 2018 Farm Bill's definition and even cross-referencing it. Ark. Code Ann. 5-64-215(d) (citing 7 U.S.C. 1639*o*).[3] The district court did not say there was any mismatch between the products Section 7 allows to be transported through Arkansas and the federal

---

[3] The district court said that Section 7 only "takes effect if any part of Sections 1-5 are enjoined," Add. 15; App. 355; R. Doc. 65-1, at 15, but it did not rely on Section 7's supposed ineffectiveness in finding express preemption. Instead, it held that Section 7 on its own terms was insufficient to save the Act from preemption. But in any event, the district court was mistaken; Section 7 took effect immediately. *See supra* at 11-12.

definition of hemp. Instead, it said that because "continuous transportation" was undefined, it was possible that Section 7 would not immunize transportation through Arkansas if a person transporting hemp through the state "stopp[ed] for gas or stay[ed] overnight." Add. 15; App. 356; R. Doc. 65-1, at 15. On that basis alone, the district court held Section 7 was an "ineffective" "attempt" to carve out interstate transportation from the Act's prohibitions. *Id.*

The phrase "continuous transport" unambiguously includes stops. The phrase "continuous transport" is a legal term of art that is well understood to include transportation with stops, not just literally continuous transportation. After all, even drivers who don't make stops hit red lights. But even if the phrase were ambiguous, the district court would have been obliged to read the phrase in a way that avoided preemption, not created it.

"Continuous transport" or similar phrases have been read to include transportation with brief stops in many cases. Most relevantly here, in *C.Y. Wholesale*, Indiana amended its ban on smokable hemp during its appeal to the Seventh Circuit to allow the "continuous transit" of smokable hemp from licensed producers to licensed handlers. *C.Y. Wholesale*, 965 F.3d at 545 (quoting Ind. Code 35-48-4-10.1(c)). Because there was some argument that the 2018 Farm Bill may preempt banning transportation as between non-licensed producers and handlers, the Seventh Circuit did not decide in the first instance whether that amendment saved

Indiana's law from express preemption. *See id.* at 549. But it had no difficulty concluding that the phrase "continuous transit" sufficed to "clarif[y] that Indiana's prohibition . . . does not apply to shipments from producers in other states that simply pass through Indiana." *Id.* It did not suggest that "continuous transit" might exclude transportation with stops.

This Court and other courts have also recognized that continuous transportation, when used in the law, includes stops. Indeed, continuous transportation and interstate transport are often used as synonyms. In *Century Indemnity Co. v. Carlson*, this Court held that the test for whether "goods are transported in interstate commerce" is "whether the entire transportation was continuous." 133 F.3d 591, 599 (8th Cir. 1998). It then held that the transportation in that case was "part of a continuous transportation," *id.*, notwithstanding stops, explaining that a "shipment with a temporary stopover in one state continues to be an interstate shipment." *Id.* Other courts agree. *See, e.g.*, *United States v. Tucor Int'l, Inc.*, 189 F.3d 834, 836 (9th Cir. 1999) (holding that a multi-segment transport of military personnel's belongings from their bases in the Philippines to their homes in the United States was "continuous transportation" under the Shipping Act's antitrust exemption); *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943) (holding that a "temporary pause in . . . transit" does not affect "the continuous nature of the interstate transit which constitutes commerce"); *Carson Petroleum Co. v. Vial*, 279 U.S. 95, 108

(1929) (holding that storing oil in a port's storage tanks while the shipper waited for a ship to arrive did not "prevent[] the continuity required in a continuous exportation"). "Continuous transportation," as used in the law, unambiguously includes interstate transportation with temporary breaks.

Yet even if Section 7's use of "continuous transportation" were ambiguous, as the district court concluded, it would have been required to read that phrase in a way that avoided a conflict with the 2018 Farm Bill's preemption clause. As this Court recently explained in interpreting Arkansas law, "Arkansas's 'first and most important rule of statutory interpretation is that a statute is presumed constitutional and all doubts are resolved in favor of constitutionality.'" *Ark. Times LP v. Waldrip*, 37 F.4th 1386, 1393 (8th Cir. 2022) (en banc) (quoting *Booker v. State*, 335 Ark. 316, 325, 984 S.W.2d 16, 21 (1998)), *cert. denied*, 143 S. Ct. 774 (2023). Reading Section 7 to not exempt transportation when a driver stays in Arkansas overnight or stops for gas runs Act 629 headlong into the Farm Bill's bar on state prohibitions of interstate hemp transport, creating a Supremacy Clause violation. Arkansas's constitutional avoidance canon precludes that reading.

Reading Section 7 to avoid preemption is especially appropriate here, given that Section 7 was obviously intended to avoid preemption, as even the district court acknowledged. *See* Add. 15; App. 356; R. Doc. 65-1, at 15 ("Section 7 . . . attempts to address the interstate commerce issue."). Given that the Arkansas

legislature patently intended Section 7 to avoid preemption, it should be read to do so where that reading is available. *See Ark. Times*, 37 F.4th at 1393 ("To the extent that there's any remaining ambiguity, the Act's legislative intent resolves it in favor of the State's interpretation."); *Gafford v. Allstate Ins. Co.*, 2015 Ark. 110, 8, 459 S.W.3d 277, 281 (2015) ("[T]he basic rule of statutory construction to which all interpretive guides must yield is to give effect to the intent of the General Assembly."). In sum, whether Section 7 unambiguously carves out all interstate transportation or is ambiguous on that point, ultimately Arkansas courts would interpret it to carve out all interstate transportation of hemp, as federal law commands. Therefore, Plaintiffs have no likelihood of success on their express-preemption claim, and this Court should reverse.

C.    Plaintiffs cannot succeed on their vagueness claim.

The district court concluded that Act 629's primary provisions were likely void for vagueness based on three undefined statutory terms: "continuous transportation," "synthetic substance," and "psychoactive substances." Add. 16; App. 357; R. Doc. 65-1, at 16.[4] Other than noting those terms are not defined, the district court did not explain what was vague about them. Nor could it have. The terms the district court claimed were vague may be undefined in Act 629, but their

---

[4] The district court also said that various terms in Section 10 were vague, *id.*, but Section 10 is not effective and would not become effective unless Act 629's primary provisions were enjoined.

meaning is not unclear.  They are terms with well-known meanings in law, chemistry, and medicine.  Plaintiffs have no likelihood of success on this claim.

Under the void-for-vagueness doctrine, a statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18 (2010).  That doctrine does not require "[l]egislatures . . . to define every term in a statute," *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 958 (8th Cir. 2019), and "[i]n the absence of a definition, words are given their ordinary meaning," *id.* (addressing vagueness challenge to an Arkansas law).

Beginning with "continuous transportation," its meaning, as discussed above, is well-understood in the law: literally unbroken transportation or transportation that includes temporary breaks or stops.  It's a phrase that has been used in multiple federal statutes—which would be void for vagueness on the district court's view—without definition.  *See, e.g.*, 46 U.S.C. 40102(26).  Indeed, the phrase is so well-understood that it is used to define *other* terms, not the other way around.  *See id.* (defining "through transportation" in the Shipping Act as, in part, "continuous transportation").  And as discussed above, even if the phrase were unclear as a purely textual matter, Arkansas's canon of constitutional avoidance, and

Section 7's obvious purpose to avoid a conflict with the Farm Bill's express preemption clause, would resolve any ambiguity.

Turning to "synthetic substances," that term is not vague either. To start, that phrase is only used in Act 629 descriptively; it does not add some otherwise unspecified class of controlled substances to the Act's coverage. Rather, the phrase precedes an enumerated list of specific substances. *See* Ark. Code Ann. 5-64-215(a)(5) ("The synthetic substances . . . included in this subdivision (a)(5) are: [as follows]."). So even if the phrase were vague by itself, it would not matter; the Act defines "synthetic substances" as used in the Act as a list of specific substances.

That said, even absent that kind of specification, there would be nothing vague about "synthetic substances." The adjective "synthetic," when used to describe a substance, describes "compounds formed through a chemical process by human agency, as opposed to those of natural origin." Random House Webster's Unabridged Dictionary 1929 (2d ed. 2001). Federal statutes, likewise, define a synthetic substance as "a substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring . . . sources." 7 U.S.C. 6502(22). Drug regulators use the term in this way; when counsel for the Arkansas Department of Agriculture sought the Drug Enforcement Administration's advice on whether delta-8 THC derived from

CBD by using a solvent was a controlled substance, the DEA wrote back that "[a]rriving at delta-8 THC by a chemical reaction starting from CBD makes the delta-8 THC synthetic." App. 124; R. Doc. 43-2, at 1. And Plaintiffs' own expert, when asked on direct examination what "the word 'synthetic' means in the chemistry world," answered that it means a chemical "reaction . . . [involving] two or more molecules that react together to form a new molecule or molecules." Tr. 41:18-24. Plaintiffs, who are sophisticated parties who market hemp products, cannot seriously claim that they lack fair notice of what a synthetic substance is.

Finally, the district court claimed "psychoactive substance" was likely vague. That too was error. First, as with the court's treatment of "synthetic substance," that holding lacks essential context. Act 629 does not ban any psychoactive substance, but only "[t]etrahydrocannabinols," other than the specific ones listed, that are "psychoactive substance[s] derived" from hemp. Ark. Code Ann. 5-64-215(a)(5)(A)(i), (a)(5)(A)(i)(j). In essence, it functions as a catch-all to capture unenumerated types of THC that share the enumerated types' psychoactive qualities. Whatever vagueness might lie in the concept of psychoactive substances generally, there is nothing vague about that. *See, e.g.*, *Monson v. Drug Enf't Admin.*, 589 F.3d 952, 955 (8th Cir. 2009) (noting that THC is "the substance that gives marijuana its psychoactive properties"). And even the term in isolation is not vague. A psychoactive substance is "a substance having a profound or significant

41

effect on mental processes."  Random House Webster's Unabridged Dictionary 1561 (2d ed. 2001); *see also Hemp Indus. Ass'n v. Drug Enf't Admin.*, 357 F.3d 1012, 1013 n.2 (9th Cir. 2004) ("A 'psychoactive' substance is one 'affecting the mind or behavior.'" (quoting Merriam-Webster Dictionary)).

None of the terms in Act 629 the district court held were vague are vague. Accordingly, Plaintiffs have no likelihood of success on their vagueness claim, and this Court should reverse.

## II.     The other preliminary-injunction factors weigh in favor of Defendants.

In holding that the other preliminary-injunction factors weighed in favor of Plaintiffs, the district court only considered the harms to them.  It ignored the harms to children ingesting synthetic THCs, as well as the harms to Arkansas's sovereign interests in the implementation of duly enacted state laws.  Considering those harms, the other preliminary-injunction factors easily weigh in favor of Defendants, and that too requires vacating the district court's preliminary injunction.

Synthetic THCs have sickened thousands of children, including dozens of Arkansans. *Supra* at 4-6.  At Arkansas Children's Hospital alone, 30 to 45 children are hospitalized a year after THC overdoses.  Dover, *supra*.  Just considering one synthetic THC, delta-8 THC, in 2022 the Arkansas Poison Control Center received 21 incident reports involving delta-8; nine involved minors, and in some instances the victims were unconscious.  Mitch McCoy, Fox16, *Loophole getting*

*Arkansans high off chemically-altered marijuana product*, Feb. 27, 2023, https://ti-nyurl.com/delta-8-loophole. Inexplicably, the district court did not acknowledge these harms, let alone weigh them against Plaintiffs' asserted monetary harms, two of which are non-Arkansas corporations that do business in many States, *see* App. 238; R. Doc. 51, at 5 ¶¶ 12-15. Had it weighed the serious health risks of letting synthetic THCs go unregulated against Plaintiffs' monetary injuries, it would have found that the balance of harms weighed in favor of Defendants.

The district court also ignored the harm to Arkansas's sovereign interests. Instead, it claimed that "[t]he public does not have an interest in the enforcement of a statute" that the district court believed was preempted. Add. 17; App. 358; R. Doc. 65-1, at 17. But the Supreme Court has held that "the inability to enforce [a State's] duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see also Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers))). This Court should reverse.

**III.  The Governor and Attorney General are entitled to dismissal because they have sovereign immunity from this suit.**

In addition to suing a number of prosecuting attorneys and heads of state agencies responsible for enforcing Act 629, Plaintiffs sued the Governor and Attorney General, who aren't responsible for enforcing Act 629.  The district court nevertheless held that the Governor and Attorney General were proper *Ex parte Young* defendants because of the Governor's general law-enforcement authority and the fact that Act 629 conditions its fallback provisions' effectiveness on the Attorney General's certification that its primary provisions are enjoined.

Yet this Court has repeatedly held—in precedent the district court ignored—that a governor's general law-enforcement power is an inadequate basis for suit under *Ex parte Young*.  And the Attorney General's certification that Plaintiffs received the very relief they asked for doesn't enforce that law; it merely advises those who do that it is no longer in effect.  To be sure, once he advises those officials that they may no longer enforce Act 629's primary provisions, they will begin enforcing its fallback provisions instead.  But the responsibility for enforcing those provisions always rests entirely with other officials; the Attorney General's role is limited to advising those officials what they legally may and may not enforce.

Under *Ex parte Young*'s exception to sovereign immunity, a "state official is amenable to suit to enjoin the enforcement of an unconstitutional state statute only if the officer has 'some connection with the enforcement of the act.'"  *Dig.*

*Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 960 (8th Cir. 2015) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). *Ex parte Young* rests on the "legal fiction" that "a state official stops being a state official when he does something contrary to federal law." *Gibson v. Ark. Dep't of Corr.*, 265 F.3d 718, 719-20 (8th Cir. 2001). So for that fiction to apply, an official must enforce the law that the plaintiff challenges in a way that the plaintiff claims is unconstitutional. Otherwise, "the officer would be sued merely 'as a representative of the state' in an impermissible attempt to 'make the state a party.'" *Dig. Recognition Network*, 803 F.3d at 960 (quoting *Ex parte Young*, 209 U.S. at 157).

Under that standard, neither the Governor nor Attorney General is a proper defendant. Beginning with the Governor, the district court's sole reason for holding she could be sued was her general law-enforcement power "as chief executive" of the state. Add. 8; App. 349; R. Doc. 65-1, at 8 (citing Ark. Const. art VI, sec. 2). Yet this Court has repeatedly held that "a governor's general-enforcement authority is not 'some connection'" to enforcing a law unless "that authority gives the governor *methods* of enforcement." *Church v. Missouri*, 913 F.3d 736, 749 (8th Cir. 2019); *see also Calzone v. Hawley*, 866 F.3d 866, 870 (8th Cir. 2017). Indeed, this Court has specifically held that "the executive authority of the [Arkansas] governor" under the Arkansas Constitution, without more, is an insufficient basis for suit. *Dig. Recognition Network*, 803 F.3d at 960 (citing Ark. Const. art. VI, secs.

2, 7).  Neither the district court nor Plaintiffs cited any "enforcement mechanism," *Church*, 913 F.3d at 749, that the Governor has at her disposal to enforce Act 629 beyond her general law-enforcement authority.  App. 239; R. Doc. 51 at 6 ¶ 16. The Governor is immune from this suit.

The Attorney General is also immune from this suit.  The Attorney General does not prosecute violations of Act 629.  Under Arkansas law, only locally elected prosecuting attorneys, not the Attorney General, prosecute offenses.  *See* Ark. Const. amend. 21, sec. 1; *State v. Knight*, 318 Ark. 158, 161, 884 S.W.2d 258, 260 (1994).  And unlike some other States, where the attorney general may participate in a prosecution on request of a county attorney or directive of the governor, *see 281 Care Comm. v. Arneson*, 638 F.3d 621, 632-33 (8th Cir. 2007), *Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1145 (8th Cir. 2005), in Arkansas there is no general authority for the Attorney General to aid a prosecution.  Instead, Arkansas law provides generally only that prosecuting attorneys may deputize attorneys in the Attorney General's office, to serve as a deputy prosecuting attorney under the prosecuting attorney's supervision.  *See* Ark. Code Ann. 16-21-149(a).  Nor does Act 629 give the Attorney General any non-prosecutorial role in enforcing Act 629.  Accordingly, the Attorney General is not a proper *Ex parte Young* defendant and is immune from this suit.

The district court, however, concluded the Attorney General is a proper defendant, solely because Act 629's effective-date clause provides that its fallback provisions go into effect upon a certification by the Attorney General that its primary provisions are enjoined.  Add. 9 & n.38; App. 350 & n.38; R. Doc. 65-1, at 9 & n.38.  That, the district court said, gave the Attorney General "a specific role in Act 629."  Add. 9; App. 350; R. Doc. 65-1, at 9.  But the question is whether the Attorney General plays any role in *enforcing* Act 629, and he does not; he only advises those who do on whether they may enforce parts of it.  That does not suffice to make him subject to suit.  As this Court has held, "[t]he Arkansas attorney general's authority to advise state officials on the constitutionality of [a state statute] . . . does not suffice to establish 'some connection with the enforcement'" of that statute.  *Dig. Recognition Network*, 803 F.3d at 962.

That also makes sense as a matter of first principles.  *Ex parte Young* allows private parties to sue state officials in their official capacity based on the fiction that they are no longer state officials when they violate federal law.  Yet on Plaintiffs' own theory, the Attorney General has not violated federal law by certifying that Act 629's primary provisions are enjoined.  Federal law is only violated, on their theory, when other officials then begin enforcing Act 629's supposedly preempted fallback provisions.  So *Ex parte Young*'s fiction cannot apply to the

Attorney General's certification, and no other basis for subjecting the Attorney

General to suit has been offered.  The Attorney General is immune from this suit.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order granting a preliminary injunction and its denial of Defendants' motion to dismiss the Governor and Attorney General.

Respectfully submitted,

TIM GRIFFIN
  Arkansas Attorney General

NICHOLAS J. BRONNI
  Arkansas Solicitor General

DYLAN L. JACOBS
  Deputy Solicitor General

ASHER L. STEINBERG
  Senior Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-1051
Asher.Steinberg@arkansasag.gov

*Attorneys for Appellees*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,597 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Times New Roman, using Microsoft Word.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

/s/ *Asher Steinberg*
Asher Steinberg

**CERTIFICATE OF SERVICE**

I certify that on November 29, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

/s/ *Asher Steinberg*

Asher Steinberg