No. 23-3237

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

BIO GEN, LLC, et al.,
Plaintiffs-Appellees,

v.

SARAH HUCKABEE SANDERS, et al.,
Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Arkansas
No. 4:23-CV-718 (Hon. Billy Roy Wilson)

**Defendants-Appellants' Reply Brief**

TIM GRIFFIN
  Arkansas Attorney General

NICHOLAS J. BRONNI
  Arkansas Solicitor General

DYLAN L. JACOBS
  Deputy Solicitor General

ASHER STEINBERG
  Senior Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-1051
Asher.Steinberg@arkansasag.gov

# TABLE OF CONTENTS

Table of Contents .................................................................................. ii

Table of Authorities ............................................................................. iii

Introduction ..........................................................................................1

Argument..............................................................................................2

    I.   The district court's preliminary injunction should be reversed
         because Plaintiffs have no chance of success on the merits...........................2

        A.  Plaintiffs cannot succeed on their various preemption
             claims.................................................................................................2

             1.   Act 629's definition of hemp is consistent with the
                  federal definition of hemp. ....................................................2

             2.   Even if Arkansas's definition of hemp were more
                  stringent than federal law's, Plaintiffs' conflict-
                  preemption claim would still fail. ........................................9

             3.   Even if Arkansas's definition of hemp were more
                  stringent than federal law's, Plaintiffs' express-
                  preemption claim would still fail. ......................................14

        B.  Plaintiffs cannot succeed on their vagueness claim. ...............................18

    II.  The other preliminary-injunction factors weigh in favor of
         Defendants. ..........................................................................................22

    III. The Governor and Attorney General are entitled to dismissal
         because they have sovereign immunity from this suit. ................................23

Conclusion ..........................................................................................28

Certificate of Compliance .....................................................................29

Certificate of Service ...........................................................................30

Appellate Case: 23-3237    Page: 2    Date Filed: 02/06/2024 Entry ID: 5360973

# TABLE OF AUTHORITIES

## Cases

*AK Futures LLC v. Boyd St. Distro, LLC*,
35 F.4th 682 (9th Cir. 2022) ............................................................ 7-8

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008) .............................................................................4

*Balogh v. Lombardi*,
816 F.3d 536 (8th Cir. 2016) ............................................................25

*Brusewitz v. Wyeth LLC*,
562 U.S. 223 (2011) ...........................................................................11

*Century Indem. Co. v. Carlson,*
133 F.3d 591 (8th Cir. 1998) .................................................. 15-16, 18

*Church v. Missouri*,
913 F.3d 736 (8th Cir. 2019) ............................................................25

*CSX Transp., Inc. v. Easterwood*,
507 U.S. 658 (1993) ...........................................................................12

*C.Y. Wholesale, Inc. v. Holcomb*,
965 F.3d 541 (7th Cir. 2020) .................................................... 9, 16-17

*Digit. Recognition Network v. Hutchinson*,
803 F.3d 952 (8th Cir. 2015) ............................................................27

*Jonesboro Healthcare Ctr., LLC v. Eaton-Moery Env't Servs., Inc.*,
2011 Ark. 501, 385 S.W.3d 797 ..........................................................5

*Maryland v. King*,
567 U.S. 1301 (2012) (Roberts, C.J., in chambers)...........................23

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)...............................................................................9

*United States v. Tucor Int'l, Inc.*,
189 F.3d 834 (9th Cir. 1999) ............................................................16

*Va. Off. for Prot. & Advoc. v. Stewart*,
563 U.S. 247 (2011)............................................................................27

*Va. Uranium, Inc. v. Warren*,
139 S. Ct. 1894 (2019) ................................................................. 11-12

iii

*Walling v. Jacksonville Paper Co.*,
   317 U.S. 564 (1943).............................................................18

**Statutes**

7 U.S.C. 1639*o*........................................................................14

7 U.S.C. 1639*o*(1) ............................................................ 3-4, 6, 8

7 U.S.C. 1639*o* note .......................................................... 10, 14

7 U.S.C. 1639p(a)(3)(A)..........................................................10

7 U.S.C. 1639p(a)(3)(A)(i) .....................................................13

7 U.S.C. 1639p(a)(3)(A)(ii) ......................................................1

7 U.S.C. 1639p(f)(2) ...................................................... 1, 10, 13

2023 Ark. Laws Act 629 (S.B. 358)

    Act 629, sec. 6...................................................................5

    Act 629, sec. 10.......................................................... 21, 25

    Act. 629, sec. 17..............................................................21

Ark. Code Ann. 2-13-503(5).......................................................3

Ark. Code Ann. 5-64-215(a)(5) ........................................... 6, 19-20

Ark. Code Ann. 5-64-215(a)(5)(A)(i) .........................................6, 20

Ark. Code Ann. 5-64-215(a)(5)(A)(i)(i) .......................................7, 20

Ark. Code Ann. 5-64-215(a)(5)(A)(i)(j) ..........................................20

Ark. Code Ann. 5-64-215(d)......................................................14

Ark. Code Ann. 20-56-403(d)(1)(C)..............................................21

Ark. Code Ann. 20-56-412(a) ................................................ 25-26

**Other Authorities**

H.R. Rep. No. 115-1072 (2018)............................................. 11-12

iv

Appellate Case: 23-3237    Page: 4    Date Filed: 02/06/2024 Entry ID: 5360973

# INTRODUCTION

For almost a century, Congress banned cannabis.  Then, six years ago, Congress lifted that ban as to a small subset of cannabis and cannabis derivatives with unusually low levels of delta-9 THC, which it dubbed "hemp."  Divining a hidden purpose on Congress's part to "redevelop a [hemp] domestic supply chain," Appellees' Br. 37, Plaintiffs say that means *States* cannot ban hemp.  But just as Congress's never banning a drug in the first place doesn't preempt States from regulating it, lifting a federal ban doesn't either.  And here, Congress said just that; it said its legalization of hemp neither preempted "more stringent" state regulations of hemp, nor laws that flatly "prohibited" hemp.  7 U.S.C. 1639p(a)(3)(A)(ii), (f)(2).

Yet whether Congress's legalization of hemp bars States from banning hemp isn't even at issue here.  For Congress only legalized hemp—not synthetic products that mimic it.  Arkansas, likewise, only banned synthetic products that attempt to skirt the delta-9 THC limit by creating some other THC.  Plaintiffs concede that Congress hasn't legalized "true synthetic cannabinoids"; they only claim that Congress legalized extracting non-psychoactive chemicals from hemp and transforming them in a lab into psychoactive ones.  But the definition of hemp only legalizes parts of the cannabis plant, and synthetically created chemicals aren't that.  So Arkansas's law bans nothing that Congress legalized at the federal level.  This Court should reverse.

1

# ARGUMENT

I.  **The district court's preliminary injunction should be reversed because Plaintiffs have no chance of success on the merits.**

   A.  <u>Plaintiffs cannot succeed on their various preemption claims.</u>

      1.  Act 629's definition of hemp is consistent with the federal definition of hemp.

Congress's federal legalization of hemp solely preempts one kind of state law: state laws that prohibit the transportation of hemp through a state to other jurisdictions. Act 629 expressly carves interstate transportation of hemp out of its reach, so it's not preempted. But even if federal law preempted more, Plaintiffs' preemption claims would fail out the gate because Act 629 does not ban any of the hemp products Congress legalized. Rather, Act 629's definition of hemp only makes plain, consistent with federal law, that the 0.3% delta-9 THC limit applies to CBD extracts. And its list of banned synthetic THCs prohibits nothing that the 2018 Farm Bill legalized, as Congress's definition of hemp solely includes parts of the cannabis plant and therefore excludes synthetic substances. Plaintiffs' arguments to the contrary either urge the Court to adopt an admittedly "nonsensical" reading of Arkansas's law, Appellees' Br. 52, or an atextual reading of Congress's hemp definition that conflates cannabis *parts* with synthetic products that merely have cannabis *sources*. Neither reinterpretation works. Act 629 is consistent with federal law.

2

a.   Act 629's definition of hemp is consistent with federal law's definition of hemp.

Act 629 and federal law define hemp in the same way.  Federal law defines hemp as the cannabis plant and any part, derivative, extract or cannabinoid thereof, with a delta-9 THC concentration of no more than 0.3 percent.  7 U.S.C. 1639*o*(1).  Act 629's definition of hemp says the same thing.  Ark. Code Ann. 2-13-503(5).  The only difference is that in addition to specifying, like the federal definition, that the plant's seeds, derivatives, extracts, cannabinoids, isomers, acids, and salts may be no more than 0.3% delta-9 THC, Act 629 specifies that one particular cannabinoid extract, the popular "hemp-derived cannab[i]diol," or CBD, may be no more than 0.3% delta-9 THC.  *Id.*  That only makes plainer what the federal definition already provides: even if a CBD extract is derived from hemp, *it* is not hemp if it contains more than 0.3% delta-9 THC residue.

Plaintiffs, however, offer a far broader reading of what the phrase "hemp-derived cannabidiol" adds to Arkansas's definition—one they admit would render the entire definition "nonsensical."  Appellees' Br. 52.  According to them, *any* cannabis product or plant must have CBD content that is no more than 0.3% delta-9 THC to qualify as hemp.  *Id.* at 31, 52.  As they explain, because CBD and delta-9 THC are different chemicals, their preferred reading of the definition "equates to asking how many apples are in an orange or how many Toyotas are in a Ford."  *Id.* at 52.  That absurd interpretation cannot be correct.

3

Plaintiffs insist that "a plain reading" of Act 629's definition requires applying an 0.3%-THC-of-CBD test to all products. Appellees' Br. 33. But their only argument for that assertion is that Arkansas courts would "presume the additional terms" in Act 629's definition "are intentional." *Id.* Defendants agree Arkansas courts would presume the phrase "hemp-derived cannabidiol" wasn't added to the definition by accident. But that doesn't answer why it was added. The most natural reading is that it was simply added to make clear that the 0.3% THC limit applies to hemp-derived CBD extracts. *See, e.g.*, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008) (rejecting a superfluity argument where a specific term "may have simply [been] intended to remove any doubt" whether it was covered by a general one). Indeed, the federal definition uses specific terms in the same way. Its inclusion of the cannabis plant "and any part of that plant" sufficed to include the plant's "seeds" and "cannabinoids," 7 U.S.C. 1639*o*(1), but Congress added those terms nevertheless to avoid any doubt. Act 629's reference to hemp-derived CBD does no more work than those terms do.

Further, rather than avoid redundancy, Plaintiffs' reading of Act 629's definition creates it. According to Plaintiffs, the reference to "hemp-derived [CBD]" dictates that to determine whether a cannabis plant is hemp, a grower must measure how much of its CBD content is delta-9 THC. But that reads a critical phrase out of the definition: "hemp-derived." Logically, a cannabis plant's CBD can't be

Appellate Case: 23-3237    Page: 8    Date Filed: 02/06/2024 Entry ID: 5360973

deemed "hemp-derived" unless the plant is already deemed hemp. So the THC content of "hemp-derived" CBD can't be the test of what hemp is. Rather, the reference to hemp-derived CBD can only mean that, when CBD is extracted from a plant defined as hemp, that extract cannot exceed the definition's THC limit.

Yet the most fundamental problem with Plaintiffs' reading of Act 629's definition is that—as they admit—it is absurd. It is possible to measure how much of a purportedly CBD extract is really THC. But as Plaintiffs argue, it is impossible to measure how much of a cannabis plant or product's actual CBD content is THC, because they are different chemicals. Appellees' Br. 52. Even posing the question is "nonsensical"—the chemical equivalent of "asking how many apples are in an orange." *Id.* Yet they read Act 629 to pose that very question. Arkansas courts would not adopt that interpretation. Under Arkansas law, even "a literal interpretation" that gives statutory language its "ordinary and common meaning . . . should be rejected" if it "leads to absurd consequences." *Jonesboro Healthcare Ctr., LLC v. Eaton-Moery Env't Servs., Inc.*, 2011 Ark. 501, 8, 385 S.W.3d 797, 802. And though the absurdity rule sets a high bar, reading Act 629 as Plaintiffs would clears it—as they acknowledge by dubbing their own interpretation nonsensical.

 b. Act 629's list of synthetic THCs is consistent with the federal definition of hemp.

In addition to defining hemp generally, Act 629 added a number of "synthetic substances" to Arkansas's controlled substances law. Act 629, sec. 6,

5

codified at Ark. Code Ann. 5-64-215(a)(5).  Each is a synthetic THC.  *See* Ark. Code Ann. 5-64-215(a)(5)(A)(i) (describing the entire list of substances added by Act 629 as "[t]etrohydrocannabinols").  Those synthetically produced THCs are not hemp under federal law for a simple reason.  To count as hemp under federal law, something must be cannabis or "a part of that plant" in the first place, no matter its delta-9 THC content.  7 U.S.C. 1639*o*(1).  THCs created in a lab aren't parts of the cannabis plant.

Plaintiffs largely agree.  They concede that synthetic THCs that do not occur naturally in cannabis, and THCs synthesized from non-cannabis sources, are not hemp under federal law.  Their only dispute is with THCs that are synthetically created from cannabis sources.  Yet those too are not hemp under federal law, and for the same reason.  If an extract from cannabis is transformed in a lab into a THC, the resulting THC is not a part of the cannabis plant.

As Defendants explained in their opening brief, Act 629's enumeration of synthetic THCs covers three kinds of synthetic products.  First, it includes a number of THC acetate esters that do not naturally occur in cannabis.  Appellants' Br. 24.  Second, it includes THCs that can occur naturally in cannabis, but are synthesized from non-cannabis materials.  *Id.* at 24-25.  Finally, it includes THCs that can occur naturally in cannabis, but are created by "a synthetic chemical process that

6

converted the industrial hemp or a substance" therein into a THC. Ark. Code Ann. 5-64-215(a)(5)(A)(i)(i); *see* Appellants' Br. 25.

Plaintiffs agree the first two categories are not hemp under federal law, as they must. As to the first, they agree that "true synthetic cannabinoids—man-made products that do not occur naturally—are dangerous and need to be controlled, and in fact they already are." Appellees' Br. 36. That concession follows necessarily from the federal definition of hemp, which only includes parts of the cannabis plant. Second, embracing the Ninth Circuit's decision in *AK Futures LLC v. Boyd Street Distro, LLC*, 35 F.4th 682 (9th Cir. 2022), Plaintiffs say "the source of the product" is "dispositive." Appellees' Br. 35 (quoting *AK Futures*, 35 F.4th at 692). If source is dispositive, THCs synthesized from non-cannabis materials are not hemp. Indeed, in *AK Futures*, the Ninth Circuit held that when delta-8 THC is "produced from non-cannabis materials," it "remains banned." *AK Futures*, 35 F.4th at 692 (internal quotation marks omitted) (quoting DEA opinion letter).

Plaintiffs' sole objection to Act 629's list of synthetic substances is its coverage of THCs synthesized from non-THC cannabis derivatives. As to those products, they claim that so long as a manufacturer starts with hemp, any THC it synthetically creates is still hemp so long as it falls below the THC limit. Appellees' Br. 35. But that draws the line in a different place than Congress did. Congress did not say that cannabis and any product whose *source* is cannabis is hemp if it

7

falls below the THC limit. Rather, it said that cannabis and "any part of that plant" is hemp if it falls below the THC limit. 7 U.S.C. 1639*o*(1). As the DEA has explained, that excludes THCs that are not "extracted from the plant," but are created "by chemical means" from chemicals like CBD that are extracted from the plant. App. 124; R. Doc. 43-2, at 1. Such THCs may have cannabis-part sources, but they are not *parts* of the cannabis plant themselves.

Rather than engage with the federal definition's text, Plaintiffs simply urge this Court to follow the Ninth Circuit, which they claim rejected a distinction between extracted THCs and cannabis-synthesized THCs in *AK Futures*. Appellees' Br. 34-35. The Ninth Circuit did no such thing. In *AK Futures*, it only decided whether delta-8 THC ceased to be hemp once it was "extracted from the cannabis plant and refined through a manufacturing process." *AK Futures*, 35 F.4th at 692. It correctly decided that mere extraction and refinement didn't mean an extract was no longer a part of the plant. Moreover, the Ninth Circuit did not have the benefit of the DEA's guidance that synthesized THCs are not hemp. Instead, it only considered, and relied on, DEA guidance that—as a first cut—distinguished between THCs derived from cannabis and ones derived from non-cannabis materials. *See id.* at 692-93.

Plaintiffs also argue the Court ought not defer to the DEA's guidance concerning synthesized THCs because the USDA, not the DEA, regulates hemp.

8

Appellees' Br. 36. It's true that the USDA regulates hemp. Yet the DEA still regulates marijuana that *wasn't* legalized as hemp, which is why it often weighs in on the line that the Farm Bill drew between the two. Moreover, Defendants don't seek controlling deference to the DEA's opinion letters and informal guidance. Rather, that guidance is only cited for its "power to persuade, if lacking power to control," in a technical area where the DEA has a wealth of expertise. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). And that guidance merely confirms the best reading of the statute.

> 2. Even if Arkansas's definition of hemp were more stringent than federal law's, Plaintiffs' conflict-preemption claim would still fail.

Act 629 doesn't prohibit anything that federal law doesn't prohibit already. But even if Act 629 did prohibit sales of hemp-derived products that federal law permits, it still wouldn't be conflict-preempted, for three basic reasons. First, the 2018 Farm Bill merely legalized hemp at the federal level. Removing a drug from federal controlled substances law doesn't bar States from prohibiting it, any more than never placing a drug on the federal list of controlled substances does. *See C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 548 (7th Cir. 2020) ("Congress's silence on [certain] drugs does not, through conflict preemption, preclude their proscription[.]"). That's all the more true here where Congress tempered its

9

legalization of hemp with stringent regulation of hemp production.  Congress was not attempting to ensure access to hemp.

Second, the 2018 Farm Bill only expressly preempted one kind of regulation of hemp: "prohibit[ing] the transportation or shipment of hemp or hemp products . . . through the State."  7 U.S.C. 1639*o* note.  That not only implies but assumes States could prohibit the production and sale of hemp within their own borders. Otherwise, it wouldn't have been necessary to preempt prohibitions of interstate hemp transport in States' hemp laws; they would have been preempted already.

Third, and dispositively, Congress *said* that more stringent state regulation of hemp than provided by the bill—and even prohibition of hemp—was permissible.  Specifically, in the bill's section on state plans for regulating hemp production, it provided that even if a State chose to regulate hemp production under USDA oversight, "[n]othing . . . preempts or limits any law of a State . . . that (i) regulates the production of hemp; and (ii) is more stringent than this subchapter." 7 U.S.C. 1639p(a)(3)(A).  And Congress further added that in States that don't submit a hemp-production plan and allow the USDA to regulate in their States, hemp production is still only allowed if "the production of hemp is not otherwise prohibited by the State."  7 U.S.C. 1639p(f)(2).

In response, Plaintiffs claim that the 2018 Farm Bill *does* tacitly preempt purely intrastate prohibitions of hemp.  To start, they say that a sentence in a

10

committee report on the bill prohibits States from defining hemp more narrowly than federal law.  Next, they say the 2018 Farm Bill's unstated purpose was to develop an unfettered supply chain and market for hemp.  And finally, they say the 2018 Farm Bill's savings clause for more stringent state regulation of hemp only saves state regulation of hemp cultivation, not its refinement or sale.  Each argument fails.

Plaintiffs place enormous weight on a statement in a conference report that they claim says States may not redefine hemp.  Appellees' Br. 30.  Their reliance on that report is unavailing for three reasons.  First, legislative history can help "shed light on what legislators understood an ambiguous text to mean," *Brusewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011), or on a statute's purposes, but it can't preempt state law on its own.  "[O]nly federal laws . . . are entitled to preemptive effect," not "abstract and unenacted legislative desires."  *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907 (2019) (plurality).  Neither the report nor Plaintiffs point to any language in the statute that the report's statement about redefining hemp explains.  Second, read in context, the statement Plaintiffs cite only suggests States may not define hemp more *broadly* than federal law.  In full, it says that "states . . . are authorized to put more restrictive parameters on the production of hemp, but are not authorized to alter the definition of hemp or put in place policies that are less restrictive than this title."  H.R. Rep. No. 115-1072, at 737 (2018).

11

Defining hemp more restrictively than federal law is a more restrictive parameter on the production of hemp; only defining it more broadly would be "less restrictive than this title." *Id.* Third, Plaintiffs' suggested distinction between prohibited re-definition and permitted regulation of hemp is incoherent. Plaintiffs say States may not define hemp more narrowly than federal law, but may regulate its production more stringently so long as they "agree with the federal government's definition as an initial matter." Appellees' Br. 39. But the two could achieve exactly the same result; a State could, as the district court agreed, "even ban [hemp] outright" so long as it called it hemp. Add. 14; App. 355; R. Doc. 65-1, at 14. That distinction makes no sense.

Next, Plaintiffs discern from the Farm Bill an unspoken yet "clear intention . . . to redevelop a domestic supply chain of hemp and hemp products that flow freely in the stream of interstate commerce." Appellees' Br. 37. Yet "any 'evidence of pre-emptive purpose,' whether express or implied, must . . . be 'sought in the text and structure of the statute at issue.'" *Va. Uranium*, 139 S. Ct. at 1907 (alteration omitted) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). And the text and structure of the 2018 Farm Bill evinces only a far narrower pre-emptive purpose: to shield interstate transport of hemp to States that allow it through States that restrict it. Nothing in the bill guarantees anyone a right to produce, buy or sell hemp in States that prohibit some or all hemp products; to

12

the contrary, the bill says that hemp production is only legal so long as it is "not otherwise prohibited by the State."  7 U.S.C. 1639p(f)(2).

Last, Plaintiffs claim the 2018 Farm Bill's savings clause only saves laws that merely regulate hemp cultivation methods because it only speaks to laws that "regulate[] the production of hemp."  Appellees' Br. 41 (quoting 7 U.S.C. 1639p(a)(3)(A)(i)).  That's wrong for multiple reasons.  First, the same section later says that hemp production may be flatly "prohibited by the State," not just regulated more stringently than federal law.[1]  7 U.S.C. 1639p(f)(2).  Second, though the savings clause only saves "law[s] that regulate[] the production of hemp," *id.*, 1639p(a)(3)(A)(i), it doesn't just save laws that *solely* regulate hemp production.  A law that both regulates hemp's production and sale by making some forms of hemp controlled substances is still a "law that regulates the production of hemp."  *Id.*  Third, Congress spoke directly only to state laws that regulate hemp production for good reason.  Hemp production is all that the 2018 Farm Bill regulates, so Congress clarified that the bill did not displace more stringent state regulation of hemp production.  Other kinds of state hemp regulation did not need express saving because nothing in the Farm Bill could have displaced them.  Fourth, even if regulation of hemp production were all that Congress expressly saved from

---

[1] In addition, hemp "production" isn't limited to growing hemp.  The Farm Bill defined hemp to include hemp plants' derivatives and extracts, so the production of hemp necessarily includes the production of those derivatives.

13

preemption, its saving that much would imply that other regulation is not preempted as well. It makes no sense that Congress would allow States to ban hemp production, but not intrastate hemp sales. It's hemp distribution and consumption, not growing hemp plants, that ultimately threatens minors.

3.     Even if Arkansas's definition of hemp were more stringent than federal law's, Plaintiffs' express-preemption claim would still fail.

The 2018 Farm Bill expressly preempts state laws that "prohibit the transportation or shipment of hemp or hemp products produced in accordance with [federal law] through the State." 7 U.S.C. 1639*o* note. Act 629 only applies to substances that federal law does not deem hemp. But to avoid any doubt, Arkansas's General Assembly carved interstate transportation of hemp out of Act 629. Section 7 provides that the Act "does not prohibit the continuous transportation through Arkansas" of hemp, precisely as defined in federal law. Ark. Code Ann. 5-64-215(d) (citing 7 U.S.C. 1639*o*).

That provision completely avoids any preempted prohibition of hemp transport that would otherwise result from Act 629. The district court thought "continuous transportation" was possibly narrower than the "transportation . . . through the State" that the 2018 Farm Bill's preemption clause protects, suggesting "continuous transportation" might exclude transportation with stops. But "continuous transportation" is a commonly used legal term of art for interstate commerce

14

that includes transportation with stops, not just literally non-stop transportation. Appellants' Br. 36-37.

Plaintiffs agree that "continuous transportation" can be read to include stops, Appellees' Br. 48; they only dispute that it unambiguously does, *id.* at 47. Their concession of ambiguity resolves their express-preemption claim; if the phrase can be read to avoid preemption, it must be. And even their argument that "continuous transportation" doesn't unambiguously include stops amounts to little more than noting that the cases that uniformly read it that way largely arose in different contexts. That's true, but Plaintiffs fail to materially distinguish those contexts from this one.

For example, responding to this Court's holding in *Century Indemnity Co. v. Carlson* that "a shipment with a temporary stopover in one state" still counts as "continuous" transportation, 133 F.3d 591, 599 (8th Cir. 1998), Plaintiffs say that decision only applied to a single form insurance policy for motor carriers. Appellees' Br. 47. That was the context in which the issue arose, but nothing in the Court's definition of continuous transportation turned on the details of that policy. To the contrary, the policy applied only to goods in interstate commerce. This Court said that the general definition in the law of whether goods are transported in interstate commerce is whether their transportation is continuous, then held that

15

shipments with temporary stops satisfy that general definition. *See Century Indem.*, 133 F.3d at 899.

Plaintiffs' distinction of the Ninth Circuit's decision in *United States v. Tucor International, Inc.*, that "continuous transportation" in a statute's definition of "through transportation" "unambiguously" included transportation with multiple stops, 189 F.3d 834, 836 (9th Cir. 1999), is equally beside the point. There, Plaintiffs say that statute was different because it defined "through transportation," whereas here "continuous transportation" is undefined. Appellees' Br. 47. But that just proves the point; "continuous transportation" wasn't defined in that statute either. Instead, it defined other terms. Yet the Ninth Circuit still held it unambiguous.

Finally, Plaintiffs' only response to the Seventh Circuit's statement in *C.Y. Wholesale* that the "continuous transit" exemption in Indiana's hemp law "clarifies" that that law did not apply to any shipments through Indiana, 965 F.3d at 545, is that the statement wasn't a holding because the Seventh Circuit still remanded whether the exemption avoided preemption on a different ground. Appellees' Br. 46. That's technically correct, but it doesn't make the statement any less persuasive. The sole reason for the Seventh Circuit's remand is that Indiana's savings clause only applied to licensed producers and handlers; the court expressed no

16

doubt that the clause otherwise exempted all interstate transportation. *C.Y. Whole-sale*, 965 F.3d at 549.

Yet even if Section 7's use of "continuous transportation" didn't unambiguously include stops, Plaintiffs' express-preemption claim would still fail. Plaintiffs admit that Section 7 is at least ambiguous; indeed they affirmatively argue that the lack of a definition of "continuous transportation" "render[s] the Act ambiguous." Appellees' Br. 48. That ambiguity, if it exists, must be resolved to avoid preemption, not to create it. Plaintiffs make virtually no argument to the contrary. They simply ignore Defendants' argument that under Arkansas's canon of constitutional avoidance, Arkansas courts would read an ambiguity to avoid federal preemption. Appellants' Br. 37. And their only response to Defendants' argument that Section 7 was patently intended to avoid preemption is that Defendants cite "no legislative history" for that purpose. Appellees' Br. 49. But Section 7's purpose is plain on its face. Even the district court acknowledged that Section 7 is an "attempt" to avoid preemption. Add. 15; App. 356; R. Doc. 65-1, at 15.

Plaintiffs' sole argument in favor of resolving the ambiguity to create preemption is that Arkansas courts would presume the General Assembly intentionally used "continuous transportation," instead of copying the preemption clause's terms, to protect less transportation than the preemption clause requires. Appellees' Br. 49. But courts don't expect a state savings clause to use identical

17

wording to a federal preemption clause. A state can exempt the same activities the federal preemption clause protects in its own words. Here, by using "continuous transportation," Arkansas merely used a common synonym for transportation in interstate commerce. *See Century Indem.*, 133 F.3d at 599 (defining transportation in interstate commerce as continuous transportation between states); *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943) (holding "the continuous nature of the interstate transit" is what "constitutes commerce"). Arkansas courts would not read Section 7 to intentionally violate the Farm Bill's express preemption clause.

B.   Plaintiffs cannot succeed on their vagueness claim.

The district court held that Act 629's primary provisions were likely void for vagueness because it did not define three of its terms. In fact, two of those terms, "synthetic substances" and "psychoactive substance," were defined by their context: Act 629 specifies which "synthetic substances" it prohibits, and Act 629 only prohibits "psychoactive substances" insofar as they are synthetic THCs derived from hemp. And the third, "continuous transportation," can only be read one way, as discussed above.

In defense of the district court's holding, Plaintiffs claim the lack of a formal definition of those terms controls, ask the Court to ignore the definitions those terms' context provides, or disagree with how Arkansas has chosen to define them.

18

But the question in a vagueness challenge is whether regulated parties can understand a statute, not whether they agree with what it says or think it could have been drafted still more clearly. Plaintiffs' own arguments show they understand this one.

Plaintiffs most stridently defend the district court's holding that Act 629's reference to "synthetic substances" is vague. Appellees' Br. 52-55. Yet as Plaintiffs acknowledge, "the statute specifically enumerates what those synthetic substances are." *Id.* at 52; *see* Ark. Code Ann. 5-64-215(a)(5) ("The synthetic substances . . . included in this subdivision (a)(5) are: [as follows]."). Their complaint isn't that they can't understand which synthetic substances are covered, but that "the enumerated list contains several substances which are, in the opinion of Plaintiffs' expert, not synthetic." Appellees' Br. 52-53. In particular, Plaintiffs say that chemically synthesized THCs that can also occur naturally in cannabis shouldn't be classified as synthetic. *Id.* at 53. Plaintiffs may not agree with Arkansas's decision to prohibit chemically synthesized THCs, but they understand that Arkansas has prohibited them. Plaintiffs counter that chemically synthesized THCs and THC extracts can't be easily told apart in a lab. *Id.* Yet Plaintiffs know how they manufacture their own products, and can find out how manufacturers they purchase from manufacture theirs. And if the products they sell contain only cannabis extracts, they can prove it.

Next, Plaintiffs claim that "psychoactive substance" is undefined and vague. Appellees' Br. 55-56. But their argument is simply a request to ignore the context in which that term appears. Act 629 prohibits "psychoactive substance[s] derived therein," Ark. Code Ann. 5-64-215(a)(5)(A)(i)(j), solely as a subset of "[t]etrohy-drocannibinols," *id.*, -(a)(5)(A)(i), which in turn are controlled only as a subset of "synthetic substances," *id.*, -(a)(5). And the antecedent of "therein" is "industrial hemp." *Id.*, -(a)(5)(A)(i)(i). So the statute only applies to synthetic THCs, other than those previously enumerated, that are both psychoactive and derived from hemp. That removes any ambiguity inherent in "psychoactive substance" alone, and rules out Plaintiffs' suggestion that the phrase could be read to encompass CBD, caffeine or sugar. Appellees' Br. 56.

As to "continuous transportation," Plaintiffs merely argue that that phrase is vague because "Act 629 fails to define" it. Appellees' Br. 57. But a definition isn't required when a term is self-defining. Every court that has ever interpreted the phrase "continuous transportation" has read it to include transportation with temporary stops, and Plaintiffs don't claim otherwise. *See* Appellees' Br. 46-47 (only arguing those decisions arose in different contexts or were dicta). And even if the phrase could be read more narrowly, constitutional avoidance and the savings clause's self-evident purpose would preclude that reading.

Next, going beyond the district court's decision, Plaintiffs suggest the Court affirm its injunction on the alternative ground that Act 629's definition of hemp is vague, reprising their argument that it defines hemp in terms of its CBD's THC content. Appellees' Br. 52. As discussed above, the definition does no such thing; it merely clarifies that hemp-derived CBD extracts are subject to its THC limit. Yet even if Plaintiffs' admittedly "nonsensical" reading of the definition were correct, *id.*, that wouldn't make the statute vague. Instead, it would clearly define hemp in a way Plaintiffs don't like. *See id.* ("No seeds on the market can guarantee this ratio."); *id.* at 33 ("This definition . . . would eliminate all legal hemp production in Arkansas.").

Finally, Plaintiffs claim that several terms in a single subparagraph of a currently ineffective section of Act 629, Section 10, are vague. *See* Appellees' Br. 57 (citing Ark. Code Ann. 20-56-403(d)(1)(C)). That claim is not properly before the Court. Section 10 only becomes effective upon a certification by the Attorney General that the State is enjoined from enforcing the Act's primary provisions. *See* Act. 629, sec. 17; App. 151; R. Doc. 43-5, at 2 (Arkansas Code Revision Commission correction of scrivener's error in effective-date section's cross-reference). If Defendants prevail on appeal, those provisions won't be enjoined, and Section 10 won't come into effect. Plaintiffs suggest Section 10 is *already* effective because the Act's primary provisions have been enjoined. Appellees' Br. 57. But as

21

Plaintiffs later concede, the Attorney General has never made the necessary certification to trigger Section 10 because the district court incorrectly included him in its injunction. *See id.* at 69 ("The injunction . . . has prevented him from making a certification."). And if Section 10 did become effective—in the unlikely event this Court affirms the injunction but dismissed the Attorney General—whether it was vague would be a question for remand, not a basis for sustaining the present injunction.

## II. The other preliminary-injunction factors weigh in favor of Defendants.

In holding that the balance of the equities weighed in Plaintiffs' favor, the district court only considered Plaintiffs' monetary injuries. It ignored the harms to children who ingest potent synthetic THCs, as well as the injury to Arkansas's sovereign interests in enforcing its laws. Plaintiffs ask this Court to repeat the same error. This Court should decline the invitation.

The synthetic THCs regulated by Act 629 have sickened thousands of children and dozens of Arkansans. Appellants' Br. 4-6. Plaintiffs don't dispute it. Instead, they merely claim that as a matter of law, a State and its citizens can only suffer irreparable harm from an injunction if the law it enjoins is constitutional. Appellees' Br. 63. That is nonsensical; whether synthetic THCs injure Arkansan minors doesn't depend on whether federal law preempts Act 629. And even a State's sovereign interest in the enforcement of its laws doesn't evaporate

22

whenever a court concludes they are likely invalid. Rather, "*[a]ny time* a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (emphasis added). Indeed in *King*, Chief Justice Roberts found irreparable harm even where he found only a "reasonable probability this Court will grant certiorari," *id.* at 1302, and only "a fair prospect" Maryland would prevail even if certiorari were granted, *id.* at 1303.

Besides disregarding Defendants' harms, Plaintiffs claim that they face "financial ruin," Appellees' Br. 61, and serious risks of criminal prosecution because Act 629 simultaneously "renders Plaintiffs' hemp and hemp products illegal," *id.*, and is unclear as to which of their products it bans, *id.* at 60-61. But Act 629 neither bans all hemp (or indeed, any hemp) nor is unclear as to which so-called hemp products it bans. Rather, its primary effect is to make plainer federal law's existing prohibition on synthetically created THCs. That may make the illegality of some of Plaintiffs' offerings clearer. But so long as Plaintiffs offer true hemp products—cannabis, or its derivatives and extracts, with less than 0.3% delta-9 THC—Act 629 will no more put them out of business than federal law has.

## III. The Governor and Attorney General are entitled to dismissal because they have sovereign immunity from this suit.

The district court refused to dismiss the Governor and Attorney General as immune from suit. It reasoned the Governor was a proper *Ex parte Young*

23

defendant because of her general law-enforcement authority under the Arkansas Constitution, and that the Attorney General was a proper *Ex parte Young* defendant because Act 629's fallback provisions only become effective upon his certification that its primary provisions are enjoined.

That was error. This Court has repeatedly held that a governor's general law-enforcement authority is an insufficient basis for suit under *Ex parte Young*. Instead, the law must give a governor methods to enforce the law plaintiffs challenge. Likewise, the Attorney General's mere power to certify that parts of Act 629 have been enjoined is not a method of enforcing Act 629. Nor is it a basis to apply *Ex parte Young*'s fiction that a state official ceases to be one when he violates federal law. On Plaintiffs' own theory, the Attorney General won't have violated federal law if he certifies their victory; only the officials who begin enforcing Act 629's fallback provisions are, on their view, violating federal law. The Court should reverse the district court's denial of the Governor and Attorney General's motion to dismiss.

Plaintiffs offer two defenses of the district court's denying the Governor sovereign immunity. First, they claim that in this context, the Governor's general law-enforcement authority does give her methods of enforcement, claiming that the Governor has "control" of the state agencies that enforce Act 629. Appellees' Br. 67. Their sole basis for that assertion, however, is that "through the operation of

24

the Arkansas Transformation and Efficiencies Act's creation of cabinet-level secretaries" the Governor can appoint cabinet secretaries who in turn appoint the state agencies' heads. *Id.* But the power to appoint officials who enforce a law—much less the power to appoint the officials who appoint them—is not a basis for suit under *Ex parte Young*. To the contrary, this Court has held that a governor's power to appoint the officials who enforce a challenged policy is a merely "administrative act" that does "not give the governor some connection" to that policy. *Church v. Missouri*, 913 F.3d 736, 750 (8th Cir. 2019); *see also Balogh v. Lombardi*, 816 F.3d 536, 546 (8th Cir. 2016) (holding that a state correction department's director's power to appoint the execution-team members who could sue to enforce a challenged non-disclosure law "has nothing to do with an execution team member's potential prosecution of such an action"). The power to appoint officials who merely appoint other officials who enforce Act 629 is even less of a basis for suit.

Second, Plaintiffs claim that Act 629 charges all state or local officials, including the Governor, with a duty to assist the Arkansas Tobacco Control in enforcing Act 629. Appellees' Br. 67 (citing Ark. Code Ann. 20-56-412(a)). To start, the provision they cite is one of Act 629's currently ineffective provisions. *See* Act 629, sec. 10. And it refers only to "enforcing this subchapter," Ark. Code Ann. 20-56-412(a), the entirety of which is also currently ineffective. Act. 629, sec. 10 (codified at Ark. Code Ann. 20-56-401 et seq.). So that provision is

25

irrelevant. Moreover, even if the provision and subchapter it referenced were currently in effect, Plaintiffs' argument would mean that under *Ex Parte Young* they could sue *any* state or local official, not just the Governor. For under the provision it is "the duty of *all* state, county and city officers to assist Arkansas Tobacco Control in enforcing this subchapter." Ark. Code Ann. 20-56-412(a) (emphasis added). That outlandish view overlooks that the provision only imposes a duty to "assist Arkansas Tobacco Control in enforcing" the law. *Id.* If Arkansas Tobacco Control is enjoined from "enforcing," *id.*, as it was through its director here, there is no duty to assist its enforcement because there is no enforcement to assist.

As for the Attorney General, Plaintiffs argue he is a proper *Ex parte Young* defendant because they want to enjoin him from certifying their victory. By blocking him from certifying that they have obtained an injunction against Act 629's primary provisions, they argue, the district court's injunction prevents Act 629's fallback provisions from going into effect and being enforced. Appellees' Br. 69. There are two fatal flaws in this argument.

First, enjoining the fallback provisions' *trigger* is unnecessary. To prevent the fallback provisions from being enforced, Plaintiffs needed to sue only the officials who would enforce them—as they did. Second, even under Plaintiffs' own claims, certifying that they have obtained an injunction does not violate federal law. To the contrary, if Plaintiffs are right on the merits it is essential to following

26

the law, as the district court recognized when it directed Defendants to "inform forthwith all the affected Arkansas state governmental entities of this injunction." Add. 18; App. 359; R. Doc. 65-1, at 18. Instead, what violates federal law on Plaintiffs' view is actually enforcing Act 629's fallback provisions, not merely triggering their effectiveness. And to sue a state official under *Ex parte Young*, a plaintiff must claim that official is "violating federal law." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011).

Plaintiffs, however, claim that isn't necessary. According to them, to sue an official under *Ex parte Young* it suffices "if 'the effect of the court's judgment on the defendant' prevents harm to the plaintiff." Appellees' Br. 69 (quoting *Digit. Recognition Network v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015)). But that is the standard for Article III redressability, not *Ex parte Young*. *See Digit. Recognition Network*, 803 F.3d at 958. And while satisfying *Ex parte Young* may usually satisfy Article III, *see id.* at 960, satisfying Article III isn't always enough to satisfy *Ex parte Young*, because *Ex parte Young*, unlike standing, requires "alleg[ing] an ongoing violation of federal law." *Va. Off.*, 563 U.S. at 255. Plaintiffs don't claim that formally certifying their victory would violate federal law, so they may not sue the Attorney General.

27

# CONCLUSION

For the foregoing reasons, this Court should reverse the district court's pre-liminary injunction and its denial of Defendants' motion to dismiss the Governor and Attorney General.

Respectfully submitted,

TIM GRIFFIN
  Arkansas Attorney General

NICHOLAS J. BRONNI
  Arkansas Solicitor General

DYLAN L. JACOBS
  Deputy Solicitor General

ASHER STEINBERG
  Senior Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-1051
Asher.Steinberg@arkansasag.gov

*Attorneys for Appellants*

28

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 6,487 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Times New Roman, using Microsoft Word.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

/s/ *Asher Steinberg*
Asher Steinberg

Appellate Case: 23-3237   Page: 33   Date Filed: 02/06/2024 Entry ID: 5360973

**CERTIFICATE OF SERVICE**

I certify that on February 6, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

/s/ *Asher Steinberg*
Asher Steinberg

Appellate Case: 23-3237     Page: 34     Date Filed: 02/06/2024 Entry ID: 5360973